UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| STEVEN R. KNISPEL,<br><br>Plaintiff,<br><br>vs.<br><br>DEB HAALAND, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR;<br><br>Defendant. | 3:21-CV-03015-RAL<br><br><br>OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff Steven R. Knispel (Knispel) sued Deb Haaland, Secretary of the United States Department of the Interior (the Secretary), alleging that the Secretary violated Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973 by engaging in race-based and disability-based discrimination against Knispel through disparate treatment, hostile work environment, retaliation, and constructive discharge. Doc. 15. The parties filed cross-motions for summary judgment. Knispel moves for partial summary judgment on the merits of his claims for race-based disparate treatment, hostile work environment, retaliation, and constructive discharge. Doc. 40 at 3. The Secretary moves for summary judgment on all claims. Doc. 41. For the reasons explained below, this Court denies Knispel's motion for partial summary judgment and grants in part and denies in part the Secretary's motion for summary judgment.

## I.   Material Facts Not Subject to Genuine Dispute

Under District of South Dakota Local Rule 56.1, both parties filed a Statement of Undisputed Material Facts accompanying their cross-motions for summary judgment. Doc. 40-2

1

(Knispel's Statement of Undisputed Material Facts); Doc. 53 (the Secretary's Statement of Undisputed Material Facts). The parties then each filed a response to the other's statement of material facts. Doc. 61 (the Secretary's response); Doc. 60-3 (Knispel's response). This Court draws the facts primarily from the undisputed portions of the parties' responses to the statements of material fact. The facts in this section are not subject to genuine dispute. This Opinion and Order also draws from additional exhibits submitted by both parties that form the factual basis for their respective statements of undisputed material facts. Where a party has objected to or disputes a material fact, a footnote is added with clarification. Because the parties filed cross-motions for summary judgment, each party's motion is evaluated independently to ensure that the facts are viewed in the light most favorable to the nonmoving party in determining whether there exist any genuine issues of material fact.

### A. Knispel's Employment and Issue of Evidence Retention and Gun Safety

Steven Knispel, a white, non-Indian male who has been diagnosed with Post-Traumatic Stress Disorder,[1] worked for the federal government in various agencies beginning in October 1992 until his retirement on December 31, 2020. Doc. 40-2 ¶¶ 1–7, 88; Doc. 61 ¶¶ 1–7, 88. During that time, Knispel primarily worked in law enforcement, first as a police officer with the Bureau of Indian Affairs (BIA) and Bureau of Reclamation, then as a park ranger for the National Park Service, and eventually as a Supervisory Police Officer in the Office of Justice Services (OJS) within the BIA. Doc. 40-2 ¶¶ 2–6; Doc. 61 ¶¶ 2–6. While working with OJS, Knispel was promoted to Supervisory Criminal Investigator (most commonly referred to as Chief of Police or

---

[1] The Parties do not dispute Knispel's race but do dispute whether Knispel has a disability. For purposes of this Opinion and Order, this Court assumes Knispel has a disability.

COP throughout the record) for the Western Nevada Agency on December 13, 2015. Doc. 40-2 ¶ 7; Doc. 61 ¶ 7.

As Chief of Police, Knispel was responsible for the operation of the law enforcement program in the Western Nevada Agency, which encompasses several tribal reservations. Doc. 81-1 at 28; see also Doc. 61 ¶ 18. His responsibilities included "planning, organizing, coordinating, and recommending policy for the criminal investigative and police program." Doc 81-1 at 28. He was tasked with "developing the program budget and monitoring expenditures, providing training to employees, and ensuring the BIA policy and procedures [were] appropriately adhered to." Id. Knispel was also responsible for supervising and conducting investigations into major criminal cases and ultimately ensuring that "all investigations [were] properly conducted and documented." Id. His job description highlighted the importance of his role in the criminal investigation process, noting that failure to carry out timely and thorough investigative work could result in the loss of prosecution opportunities for convictions involving major crimes. Id.

During his first eight years of employment with BIA OJS, Knispel had no "documented history of misconduct offenses or prior disciplinary actions." Id. at 58. Shortly into Knispel's tenure as Chief of Police, however, the murder charge in the case United States v. Medina was dismissed after a court concluded the Western Nevada Agency mismanaged evidence. Id. at 84–90; United States v. Medina, 3:16-CR-00009-LRH-WGC (D. Nev. 2016). Compounding the situation, Knispel left his government-issued firearm unsecured in a restroom while an investigation into the missing evidence remained ongoing. Doc. 50-2 at 11–12; Doc. 40-1 at 21.

The parties dispute the reasons for the mismanagement of evidence in Medina but agree to the underlying circumstances that follow. On February 17, 2016, Rafeal Alfonso Medina Jr. was indicted on one count of Murder within Indian Country for the death of his father. Doc. 81-1 at

74; Doc. 40-2 ¶ 20; Doc. 61 ¶ 20.  The BIA Western Nevada Agency (WNA) was responsible for managing evidence from the crime scene.  See Doc. 40-2 ¶ 26; Doc. 61 ¶ 26.  During the initial stages of the investigation, Special Agent Marla Hernandez, an evidence control technician for WNA, managed the Evidence Control Program.  Doc. 81-2 at 70.[2]  Multiple audio recordings containing interviews were listed in Hernandez's reports as having been conducted, recorded, and sent to the prosecutors; however, the prosecutors never received them.  Id. at 74.[3]  Further, the recordings could not be recovered on Hernandez's government-issued laptop hard drive or on an external hard drive.  Id. at 73.  Hernandez resigned from her position as evidence control technician in October 2016 and subsequently resigned from federal services in January 2017.  Id. at 70; see Doc. 61 ¶ 23.

Following Hernandez's resignation, Lieutenant Derek Martin assumed the role of evidence control technician in October 2016.  Doc. 81-2 at 70; Doc. 61 at ¶ 24.  At that time, multiple evidence control rooms existed in the WNA, and the evidence concerning the Medina case was

---

[2] The parties dispute the exact date Hernandez "resigned" or "retired."  See Doc. 61 ¶ 23.  However, the document both parties cite states that she acted as evidence control technician for WNA until October 27, 2016, and left federal services on January 5, 2017.  Doc. 81-2 at 70; see also Doc. 81-1 at 70 (admitting internal documents indicate Hernandez resigned as evidence control technician on October 27, 2016).  For purposes of these motions, the exact date is immaterial, and the parties agree Hernandez acted as evidence technician, and Martin assumed the duty thereafter.

[3] Secretary Haaland objects that the email communications in Plaintiff's Exhibit 12, Doc. 81-2 at 74, that detail this fact are privileged and alternatively hearsay.  The communications are not privileged because they were not made as part of the representation of the BIA as a client.  See United States v. Spencer, 700 F.3d 317, 320 (8th Cir. 2012) (requiring the communications be "made for the purpose of facilitating the rendering of legal services to the client").  Rather, in an email to Knispel, the prosecutor inquired as to the whereabouts of missing evidence and stated the locations they had searched to that point.  These communications were related to the Medina investigation and not made for rendering legal services to the BIA.  The statements do not appear to be hearsay because they are not offered for the truth of the matter asserted.  Instead, the statements are offered to prove the BIA was aware of missing evidence and aware that Hernandez handled the evidence.  See Fed. R. Evid. 801(c).  As discussed below, it remains unclear when the evidence went missing or what caused the evidence to go missing.

located in Carson City, Nevada. Doc. 81-2; Doc. 81-3 at 26–27; see Doc. 60-3 at ¶¶ 23–26. According to Knispel, the evidence refrigerator located at the Carson City control room had consistent problems maintaining its temperature beginning in May 2017. Doc. 81-3 at 26. Knispel decided the evidence control room should be moved to McDermitt, Nevada, as it was standard practice in the BIA to consolidate evidence storage in one location, and Knispel believed the McDermitt location was more compatible for the refrigeration units. Doc. 60-3 at ¶ 25; Doc. 81-3 at 26–27. Knispel directed Martin to transport evidence from Carson City to McDermitt using a horse trailer. Doc. 60-3 at ¶¶ 26–27. Knispel assisted Martin in removing evidence from the Carson City control room and placing it into the trailer, which was eventually transported to McDermitt. Id. Evidence continued to be moved from Carson City to McDermitt into September 2017. During that time, two more incidents arose relating to the move. On September 12, 2017, after learning that subordinate employees were unable to lift some heavier equipment, Knispel sent a text message to one of the employees calling them "pussies." Doc. 40-1 at 19.[4] On September 20, 2017, the door to the McDermitt facility was propped open and allegedly left unsecured. Id. at 20.[5]

On August 30, 2017, an attorney prosecuting the Medina case notified Knispel that at least a dozen recorded interviews were missing. Doc. 81-2 at 74. Knispel responded on September 15, 2017, detailing the efforts his agency undertook to locate the evidence but without success. Id. at 73. On September 27, 2017, the BIA issued a Serious Incident Report regarding the missing evidence. Id. at 82. In addition to the recorded interviews, physical and biological evidence was

---

[4] Knispel admits to this fact but argues the reprimand he received was disproportionate. Doc. 40-1 at 19.
[5] Knispel disputes whether the facility was left unsecured and whether he was responsible but contends that even assuming responsibility, his reprimand was disproportionate. Doc. 40-1 at 20.

also missing or destroyed. See Doc. 61 ¶ 50. On December 9, 2017, the United States Attorney's office filed a memorandum in Medina detailing Special Agent Parnell's investigation of the WNA's Evidence Control Program and the status of the missing evidence. Medina, 3:16-CR-00009-LRH-WGC (No. 34-1). Ultimately, the evidence was not recovered, and as a result, the court dismissed the murder charge on February 28, 2018. Doc. 61 ¶ 20; Medina, 3:16-CR-00009-LRH-WGC (No. 47).

The Internal Affairs Division investigated the mishandling of evidence and was unable to determine when the evidence went missing. See Doc. 61 ¶¶ 46–48, 57. Special Agent Parnell, the primary investigator, stated the evidence "could have been lost from any point from the time [it was] collected to the time that [he] began looking into it." Doc. 60-6 at 4–5. Thus, it remains unclear if evidence was lost during Hernandez's time as evidence control technician, during Martin's time as evidence control technician, or during the transfer of evidence from Carson City to McDermitt. See Doc. 61 ¶¶ 46–48, 57.

On October 6, 2017, shortly after the Internal Affairs Division issued the Serious Incident Report, Knispel left his government-issued firearm unsecured in a restroom of a federal building. Doc. 40-1 at 21. This building was accessible to other BIA employees, visitors, and members of the public. Id. The firearm was discovered by another federal employee, Special Agent Parnell. Doc. 50-2 at 11-12. Knispel admits he left his firearm in the restroom unsecured but argues his reprimand was disproportionate. Id.; Doc. 40-1 at 21.

## B. Disciplinary Actions and EEO Contact

### 1. Employment Actions from 2017 to First EEO Complaint

After the WNA became aware of the missing evidence in Medina, Assistant Special Agent in Charge (ASAC) Jamie Kootswatewa referred three matters to the Internal Affairs Division

relating to Knispel for investigation: mishandling of evidence, disparaging remarks made to subordinates, and leaving a building unsecured. Doc. 60-3 ¶ 14. While under investigation, Knispel was subject to several employment actions, including changes in his Employee Performance Appraisal Plan, reassignment of duties, and placement on administrative leave. Believing he was being treated differently because of his race and disability, Knispel contacted the agency's Equal Employment Opportunity (EEO) department.

In October 2017, ASAC Kootswatewa, Knispel's first-line supervisor from summer of 2017 to November 2017 rated Knispel "minimally successful" on his 2017 Employee Performance Appraisal Plan (EPAP). Doc. 79-2 at 3; Doc 49-3 at 2, 7. On April 23, 2018, Clinton Funk was designated as Plaintiff's direct supervisor with Special Agent in Charge (SAC) Laura Naranjo as secondary supervisor. Doc. 61 ¶ 12. Knispel then appealed his EPAP rating, and an amended 2017 EPAP was completed, adjusting his minimally successful rating to a fully successful rating of 3.4. Doc. 81-4 at 7; Doc. 61 ¶¶ 122–23. Knispel's 2018 EPAP rating was "3.0 Fully Successful." Doc. 81-4 at 7. Knispel did not receive a performance evaluation from his supervisory team for the time he was employed in 2019 or 2020.[6] Doc. 15 ¶ 40; Doc. 16 ¶ 40.

On November 14, 2017, SAC Naranjo notified ASAC Selanhoongva McDonald that Knispel was to be given a 120-day detail to the Uintah & Ouray Agency. Doc. 61 ¶ 107; Doc. 81-3 at 95. On June 25, 2018, ASAC Funk notified Knispel of another temporary duty assignment with the Uintah & Ouray Adult Detention Facility for inmate management, prisoner transports, medical and meal distribution, and control panel operation for thirty days. Doc. 81-4 at 1–2. While at this duty station, Knispel retained his grade, salary, and title of Chief of Police for WNA. Id.

---

[6] Secretary Haaland objects to this fact in its response to Knispel's statement of material facts. See Doc. 61 ¶ 121. However, Secretary Haaland earlier admitted to this fact in the Secretary's Answer to the Amended Complaint. See Doc. 16 ¶ 40.

The notice stated the temporary assignment was based on "current staffing and operational needs of BIA OJS." Id. at 2. The notice also referenced the Internal Affairs Division's investigation into "reported incidents of alleged misconduct for which disciplinary action may be proposed in the future." Id. This temporary duty assignment was not to exceed 30 calendar days and was to automatically expire on July 24, 2018. Id. at 1. However, the assignment could be terminated or extended at the "discretion of Agency management." Id.

On July 13, 2018, Knispel emailed ASAC Funk about his reassignments, stating that the reassignments, which required him to "operate a marked law enforcement vehicle" without his "assigned duty weapons" placed him in danger and placed the government at risk of liability. Doc. 81-3 at 79. ASAC Funk forwarded Knispel's concern to Knispel's secondary supervisor SAC Naranjo and stated:

> I [(ASAC Funk)] have been provided directives that have placed myself at risk of personal liability, including being directed to issue a directive to TDY [(Temporary Duty Assignment)] Steven Knispel to transfer marked law enforcement vehicles for OJS throughout the country without personal knowledge that he had his weapons removed from his care without authorization for re-issuation.

Doc. 81-3 at 78. Funk's email expressed he no longer wished to supervise Knispel, citing the "numerous historically adversarial supervisory situations." Id. SAC Naranjo responded on July 16, 2018:

> You are performing your duties in consultation with HR for their expertise. You are following their guidance. Please continue doing so as you continue supervising COP Knispel, and as you are with the other COP's under your supervision. All you can do is take one matter or topic at a time and address it accordingly. As it appears you have been doing correctly. In close dialogue with HR experts to ensure proper procedures.
>
> ASAC McDonald and I are parties to other EEO matters that COP Knispel has filed prior to your arrival in District III in March 2018.

Id. at 80. Thus, ASAC Funk remained Knispel's supervisor.

On August 16, 2018, ASAC Funk, reassigned Knispel to the BIA OJS District I in Aberdeen, South Dakota. This detail's duties included transporting Law Enforcement and Corrections Government Owned Vehicles over long distances throughout the United States. Doc. 61 ¶ 114. This reassignment would be Knispel's final assignment before being issued a Notice of Removal from Federal Service.

The record does not specify the exact date the decision to issue Knispel a Notice of Removal was made. However, emails between human resource officials and Knispel's supervisory team indicate that a decision was made in or prior to July 2018. On August 2, Barry Farbor, a human resource specialist for the Office of Human Capital Management, emailed an update regarding the draft of the Notice of Removal:

> I have been attempting to devote most of my workdays during the last few weeks to reviewing the IAD Reports of Investigation and drafting a Notice for the proposed removal of COP Steven Knispel, and I am probably at least 60% finished with the first draft of the Notice that will be forwarded to the Office of the Solicitor as soon as I complete a final preliminary draft.
>
> This removal action has been identified by OJS Director Addington as the current #1 priority case file being handled by the Reston OHCM HR Staff.

Doc. 81-4 at 23.

> On August 9, 2018, Farbor sent an email to Knispel's supervisory team:
>
> COP Knispel must not receive a promotion to GS 1811-13 which would be very detrimental to the pending removal action. It is recommended that the Agency response to his inquiry should inform him that any promotion for which he might be currently eligible will be deferred pending the outcome of the anticipated proposal for an adverse personnel action based on the completed IAD investigations related to his several incidents of misconduct. I am working every day on his file and drafting a lengthy and complex Notice letter for his proposed removal to be forwarded to the Office of the Solicitor (SOL) for a legal sufficiency review. I am hoping to send the first HR draft of the Notice letter to the SOL tomorrow (Friday 08/10/2018).

Doc. 81-4 at 6.

9

On December 6, 2018, ASAC Funk issued Knispel a Notice of Proposed Removal from Federal Service (2018 Notice of Removal). Doc. 81-1 at 47–66. The Notice cited five charges: (1) discourteous conduct; (2) careless or negligent performance of duty; (3) failure to safeguard criminal evidence; (4) inability to perform full range of duties; and (5) disregard of a supervisory directive. Id. at 47. The Notice further provided: "Effective immediately, you are placed on paid administrative leave during the 30-day notice period[,] and you are directed to surrender your government-owned property and equipment and exit the federal work place." Id. at 65 Knispel was not allowed to report for work at BIA OJS unless "specifically approved or directed by [ASAC Funk] or another supervisor in [his] chain of command." Id.

Richard Melville was designated the deciding official concerning Knispel's removal. Doc. 61 ¶ 82. At the time the 2018 Notice of Removal was issued, Melville was the Deputy Associate Director for the Field Operations Division. Doc. 46 ¶ 2. As Deputy Associate Director, Melville was the direct supervisor of the Special Agents in Charge in WNA. Id. at ¶ 4. Knispel had the opportunity to respond to the 2018 Notice of Removal, and Melville was to "give full consideration to [Knispel's] reply and [issue] a written decision at the earliest practicable date afterward." Doc. 81-1 at 65. If Knispel elected not to reply, a written decision was to be issued "as soon as practicable after expiration of the time allowed for a reply." Id. The 2018 Notice of Removal further specified, "If sustained by the deciding official, the proposed action will not be effective earlier than 30 calendar days from the date you receive this letter." Id. at 65. Knispel never received a written decision on the 2018 Notice of Removal but rather began a prolonged period on administrative leave. Doc. 61 ¶ 88.

### 2. Knispel's EEO Activity and 2018 EEO Complaint

10

On October 23, 2017, Knispel made initial contact with the Agency EEO Office. Doc. 60-3 ¶ 1; Doc. 79-2 at 2. In his request to speak to an EEO counselor, Knispel cited "a progressively worsening work environment" within his district's OJS supervisory team. Doc. 79-2 at 8. His supervisory team at that time included ASAC Selanhoongva McDonald, ASAC Jamie Kootswatewa, and Special Agent in Charge (SAC) Laura Naranjo. Knispel's supervisory team consisted of individuals who identified as Native American or part Native American.[7] Knispel met with an EEO Counselor on October 25, 2017, to discuss the alleged issues. Id. at 2. According to Knispel, October 25 was the same day Knispel learned ASAC Kootswatewa rated him "minimally successful" on his 2017 EPAP. Doc. 79-2 at 3; Doc 49-3 at 2, 7.

On December 12, 2017, Knispel participated in an initial interview with the EEO Counselor. Doc 49-3 at 3. The EEO Counselor sought to resolve Knispel's allegations to no avail. Id. On February 9, 2018, Knispel filed a formal complaint under Title VII and the Rehabilitation Act. Id. Knispel amended his complaint three times, and each amendment was accepted respectively on May 22, 2018, August 24, 2018, and November 28, 2018. Id.

Knispel's allegations include being subjected to disparate treatment and/or a hostile work environment on the bases of race, disability (PTSD), and/or reprisal for filing the complaint. Doc. 49-3 at 1. After incorporating the three amendments, Knispel's 2018 EEO Complaint contained 15 claims. The Office of Diversity, Inclusion and Civil Rights, the body who issued the Final Agency Decision, added *sua sponte* the sixteenth claim concerning the 2018 Notice of Proposed Removal. Doc. 49-3 at 3 n.2. Those 16 claims were:

1. From Spring 2017 to present, the Assistant Special Agent in Charge [Kootswatewa] and ASAC 2 [McDonald] continuously chastised, rebuffed,

---

[7] Evidence Control Technicians Hernandez and Martin are also Native American, and Martin became "Acting Chief of Police" during Knispel's absence from the position.

personally attacked, and threatened Complainant with reprimand, both verbally and via email;

2. Between summer 2017 and October 25, 2018, [ASAC Kootswatewa] and [ASAC McDonald] engaged in biased questioning and accused Complainant of misconduct, which were accompanied by Internal Affairs (IA) investigations;

3. On October 25, 2017, [ASAC Kootswatewa] informed Complainant that [ASAC Kootswatewa] rated Complainant Minimally Successful (2.0) on one of Complainant's elements in Complainant's Fiscal Year (FY) 2017 Employee Performance Appraisal Plan (EPAP);

4. In early November 2017, [ASAC McDonald] denied Complainant's request to charge forty-five days of leave as part of an Office of Workers Compensation Program (OWCP) claim to manage Complainant's PTSD. Complainant was directed to charge his leave to his personal leave balance;

5. On December 8, 2017, [ASAC McDonald] issued a memorandum to Complainant instructing Complainant to turn in his firearm, badge/credentials, and other government issued equipment because he was on leave for more than thirty consecutive days;

6. For an unspecified period in 2017, [ASAC McDonald] temporarily reassigned Complainant from his position as Chief of Police to Agency Special Agent;

7. On unspecified dates in 2017, [ASAC Kootswatewa] and [ASAC McDonald], despite the availability of funds, refused to approve purchase requests that Complainant submitted for equipment necessary to fulfill Complainant's duties as a supervisor;

8. On an unspecified date, Complainant learned that a Criminal Investigator made a statement that it was wrong to hire Complainant because Complainant was Caucasian and not Native American;

9. In May 2018, Complainant alleges ASAC 3 [Funk] discussed relocating Complainant's and other employees' offices after [ASAC McDonald] and the Agency Superintendent already negotiated an office space agreement;

10. In May 2018, in a conference call, [ASAC Funk] advised Agency staff that Complainant's designation as Custodial Property Officer (CPO) would be terminated as of May 30, 2018;

11. In May 2018, the Supervisory Agent in Charge (SAC) implemented a restrictive leave request and use memorandum for district supervisory staff, which affected supervisory staff's ability to take leave, in order to affect Complainant's ability to use annual leave when his sick leave balance is low due to an extended illness that depleted Complainant's leave balance;

12. In May 2018, acting supervisory personnel within the Agency were used to initiate an inquiry into an unpaid invoice for the purchase of cell phone boosters for three Agency vehicles in an attempt by the Acting Chief of Police to initiate an unauthorized purchase and ratification action against Complainant;

13. On August 6, 2018, [ASAC McDonald] informed Complainant that he would be raising his FY 2017 EPAP from Minimally Successful to Fully Successful, but then subsequently informed Complainant that his EPAP was on hold pending IA investigations;

14. On August 15, 2018, the Lieutenant initiated an email concerning a discussion with Complainant on the possible loss of a government wireless device at the Phoenix Airport;

15. On August 16, 2018, [ASAC Funk] reassigned Complainant to District I to transport law enforcement vehicles; and

16. On December 6, 2018, Complainant received a Notice of Proposed Removal.

Id. at 1–3.[8]

The Agency conducted a formal investigation of Knispel's claims from July 2018 to March 2019. Id. In April 2019, the Agency issued its Report of Investigation; however, the Agency determined that the report was insufficient and remanded it for a supplemental investigation. Id. The Agency conducted a supplemental investigation and issued its Supplemental Report of Investigation in April 2021. Id.; Doc. 49-16 at 4–7. Both the Report of Investigation and the Supplemental Report of Investigation described the dates of the alleged discrimination as "December 28, 2017 – ongoing." Doc. 81-1 at 2; Doc. 49-16 at 5.

On May 26, 2021, the Office of Diversity, Inclusion and Civil Rights issued the Final Agency Decision finding that Knispel failed to prove that he was subjected to disparate treatment and/or harassment on the bases of race, reprisal, or disability. The Final Agency Decision contained notice of the right to file a civil action in U.S. District Court as set forth in 29 C.F.R. § 1614.110.

### 3.  Employment Actions After 2018 EEO Complaint

---

[8] The Final Agency Decision, Doc. 49-3, states that Knispel's claims of reprisal are "only in connection with incidents occurring after May 2018." Id. at 1 n.1. The Final Agency Decision did not include claim 16 in its discussion on reprisal even though the claim occurred after May 2018. Id. at 1 n.1., 32. This Court also notes that the Final Agency Decision restates claim 15 as the claim 16 heading in the statement of facts and discussion sections. Id. at 15, 31 ("16. On August 16, 2018, RMO 3 reassigned Complainant to District 1 to transport law enforcement vehicles."). However, the body of both sections discusses Knispel's December 2018 "proposed termination." Id. Thus, the Office of Diversity, Inclusion and Civil Rights had sufficient opportunity to investigate and address claim 16.

Because the 2018 Notice of Removal was not acted upon, Knispel remained on administrative leave through 2020. Doc. 61 ¶ 88. The parties dispute whether placement on administrative leave for two years was a departure from applicable OJS policy and procedure. Doc. 61 at ¶ 89. Department of the Interior Office of Human Resources policy concerning employee discipline states, "The placement of an employee on administrative leave does not constitute an adverse action, but should only be done in the most exceptional situations (i.e., cases involving proposed removals or indefinite suspensions), when all other options are considered imprudent." Doc. 68-2 at 13. The policy further states:

> Only bureau/office heads, their deputies, or the Director, OHR, may authorize the placement of an employee on administrative leave for an extended period of time (i.e., beyond 45 days); this authority may not be re-delegated. Bureau/Office heads (or their deputies) must coordinate decisions regarding the placement/continuation of an employee in an administrative leave status for more than 45 days with the Director, OHR, who will review such decisions for the Department and may rescind them if considered inappropriate.

Id. Knispel's time on administrative leave apparently was extended at least two times. Doc. 81-3 at 92. However, nothing in the record indicates that the timeframe for the deciding official to act on the 2018 Notice of Removal was extended.

On March 10, 2020, Melville issued Knispel a Rescission of Proposal to Remove, which revoked the 2018 Notice of Removal "due to the passage of time, as well as administrative issues surrounding this matter." Doc. 70-8. That same day, Melville issued Knispel a second Notice of Removal. Doc. 46-1. In his deposition, Melville was unable recall why he was asked to reissue the proposed removal of Knispel, Doc. 46 ¶ 14, nor could he recall what the administrative issues were surrounding Knispel's proposed removal, Doc. 61 ¶ 85.

The 2020 Notice of Removal contained six charges: (1) Mishandling of Criminal Evidence; (2) Careless or Negligent Performance of Duty; (3) Conduct Unbecoming a Supervisor; (4) Failure

14

to Safeguard Criminal Evidence; (5) Failure to Safeguard a Government Facility; and (6) Failure to Safeguard Your Government Firearm. Doc. 46-1 at 1. The first five charges contain the same factual bases as the charges articulated in 2018 Notice of Removal. Id.; Doc. 81-1 at 47. The sixth charge had previously been incorporated in the 2018 Notice of Removal as Specification D of Charge 2 "Careless or Negligent Performance of Duty." Doc. 46-1 at 1; Doc. 81-1 at 55.

The deciding official for the 2020 Notice of Removal was Timothy LaPointe, the Regional Director of the Great Plains Region for the BIA. Doc. 46-1 at 18. On November 30, 2020, LaPointe issued a Decision to Remove, effectively terminating Knispel from federal employment. Doc. 50 ¶ 7; Doc. 50-2. LaPointe's Decision of Removal sustained all six charges from the Notice of Removal, finding each charge was "fully supported by the record." Doc. 50-2 at 14-17. Knispel was not removed on December 1, 2020, following the Decision to Remove. Rather, Knispel remained on paid administrative leave until effectuation of his mandatory retirement on December 31, 2020. Doc. 60-3 at ¶ 72; Doc. 61 ¶¶ 153–156.

#### 4. 2021 EEO Complaint

Knispel made initial contact with the EEO Counselor a second time on December 31, 2020, after receiving the 2020 Notice of Proposed Removal. Doc. 49-1 at 1. He filed a formal complaint in February 2021 alleging instances of reprisal for his 2018 complaint. Doc. 69-6. The Agency ordered a formal investigation on May 19, 2021, and the investigation lasted through August 10, 2021. Id. at 2. The Office of Diversity, Inclusion and Civil Rights then issued a Final Agency Decision, addressing two claims based on reprisal for prior EEO activity concerning Knispel's 2018 complaint:

1. On December 1, 2020, Complainant was issued a second Letter of Proposal to Remove from Federal Service; and
2. Complainant retired from the Federal government after management officials failed to provide pertinent investigation and retirement information he

15

requested to address the Letter of Proposal to Remove him for Federal Service, resulting in constructive discharge.

Id. at 1-2. The Final Agency Decision on May 11, 2022, again found that Knispel failed to prove his claims and notified Knispel of the right to file a civil action in U.S. District Court as set forth in 29 C.F.R. § 1614.110.

On August 25, 2021, following receipt of the Final Agency Decision regarding his 2018 EEO Complaint, Knispel filed this lawsuit. Doc. 1. Knispel then filed an Amended Complaint, Doc. 15, on March 23, 2022, while review of his 2021 EEO Complaint remained ongoing.

## II.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Motg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007). Cases alleging discrimination are subject to the same summary judgment standard as any other case. Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

16

When, as here, the parties file cross-motions for summary judgment, each party's motion must be evaluated independently in accordance with the standard weight of evidence accorded to the nonmoving party to determine if there is any genuine issue of material fact. See Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983); see also St. Luke's Methodist Hosp. v. Thompson, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

## III.    Discussion

### A.    Administrative Exhaustion

A federal employee alleging discrimination and retaliation prohibited by Title VII and the Rehabilitation Act "must initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1). The 45-day time limit is extended if the aggrieved employee is able to show that he or she was not notified of the time limits and was not otherwise aware of them, that he or she was unaware the personnel action occurred, or that he or she was prevented by circumstances beyond his or her control from complying with the deadline. Id. § 1614.105(a)(2). Bailey v. U.S. Postal Serv., 208 F.3d 652, 654 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has recognized that "[e]xhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts." Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222 (8th Cir. 1994). Administrative exhaustion is a "processing rule," not a "jurisdictional prescription." Fort Bend Cnty. v. Davis, 587 U.S. 541, 551 (2019). Where the failure to exhaust defense is raised, a district court must "undertake the necessary detailed analysis

of what claims were fairly included in [the] informal and formal administrative complaints."
Patrick v. Henderson, 255 F.3d 914, 916 (8th Cir. 2001).

The Supreme Court of the United States, in National Railroad Passenger Corp. v. Morgan,
536 U.S. 101, 112 (2002), addressed what constitutes the timely filing of Title VII claims and
clarified the continuing violation doctrine. Under Morgan, a "plaintiff raising claims of discrete
discriminatory or retaliatory acts must file his charge within the appropriate time period," while a
charge alleging hostile environment will not be time barred "so long as all acts which constitute
the claim are part of the same unlawful employment practice and at least one act falls within the
time period." Id. at 122.

The Secretary contends that several claims alleged in Knispel's Amended Complaint
should be barred for failure to exhaust. Doc. 52 at 11-17. As noted in the Secretary's supporting
memorandum, the Amended Complaint does not clearly delineate which factual allegations
correspond with which claim. Id. at 16 n.2. For example, Knispel uses the same factual allegations
to support his disparate treatment and hostile work environment claims. Doc. 15 at 9–11. To
address whether Knispel's claims have been exhausted, this Court must distinguish alleged
"discrete discriminatory or retaliatory acts" from acts allegedly contributing to a hostile work
environment. Morgan, 536 U.S. at 122.

### 1. Alleged Discrete Acts of Discrimination or Retaliation

Knispel's Amended Complaint, Doc. 15, alleges nine discrete discriminatory or retaliatory
acts: (1) ASAC Kootswatewa rated Knispel "Minimally Successful" on his EPAP, id. ¶ 24; (2)
ASAC McDonald denied Knispel's request to charge 45 days of leave as part of an Office of
Workers Compensation Program, id. ¶ 25; (3) ASAC McDonald temporarily reassigned Knispel
to Agency Special Agent, id. ¶ 27; (4) ASAC Funk reassigned Knispel to the position of "law

enforcement vehicle transporter" in a different district, id. ¶ 35; (5) Knispel was issued the 2018 Notice of Proposed Removal, id. ¶ 37; (6) Knispel was denied a promotion and yearly step increase which would have allowed retirement as a GS13 Step 03, id. ¶ 39; (7) Knispel was placed on administrative leave from December 2018 until his retirement on December 31, 2020, id. ¶¶ 41, 86; (8) Knispel was issued the 2020 Notice of Proposed Removal, id. ¶ 38; (9) Knispel was constructively discharged, id. ¶¶ 82-88.

The Secretary argues Knispel failed to timely exhaust the first seven of the above discrete acts—paragraphs 24, 25, 27, 35, 37, 39, and 41 of the Amended Complaint. Doc. 52 at 16–19, 34–37. The Secretary views these claims as not exhausted because, despite being accepted for investigation and addressed in the Final Agency Decision, they occurred after Knispel's initial contact with the agency EEO Office on October 23, 2017, and Knispel did not contact the EEO Counselor again for each claim within 45 days of the alleged subsequent acts of discrimination or retaliation under 29 C.F.R. § 1614.105(a)(1). Id. at 16, 18. The Secretary's interpretation of the 45-day contact requirement is too restrictive. Section 1614.105(b)(1) instructs that EEO Counselors must advise individuals "that only the claims raised in *precomplaint counseling* (or issues or claims like or related to issues or claims raised in pre-complaint counseling) may be alleged in a subsequent complaint filed with the agency." 29 C.F.R. § 1614.105(b)(1) (emphasis added). Thus, the 45-day contact requirement does not prohibit a complainant from raising issues or claims of discrimination or retaliation that occur between a complainant's initial contact with the EEO office and his initial counseling. Further, the complainant may properly exhaust any claims "like or related to issues or claims raised in pre-complaint counseling," by raising them in the agency complaint without the need to reinitiate contact with the agency EEO Office. Id.; see

19

also <u>Wedow v. City of Kansas City</u>, 442 F.3d 661, 675 (8th Cir. 2006) ("[W]e have not wholly abandoned the theory that reasonably related subsequent acts may be considered exhausted.").

Knispel made initial contact with the agency EEO Office on October 23, 2017, but his precomplaint counseling did not occur until December 12, 2017.[9]  Doc. 69-5.   Knispel timely could allege discrete acts of discrimination and retaliation occurring from September 8, 2017 (45 days before his initial contact) to December 12, 2017, in his administrative complaint.  Therefore, the following claims in Knispel's Amended Complaint have been timely exhausted because they occurred after initial contact and before his precomplaint counseling and were raised in Knispel's 2018 EEO Complaint:

> Paragraph 24: October 25, 2017, ASAC Kootswatewa rated Knispel "Minimally Successful" on his annual EPAP. Doc. 15 ¶ 24; <u>see also</u> Doc. 49-5 ¶ 3.

> Paragraph 25: November 2017, ASAC McDonald denied Knispel's request to charge forty-five days of leave as part of an Office of Workers Compensation Program claim to manage Knispel's Post Traumatic Stress Disorder. Doc. 15 ¶ 25; <u>see also</u> Doc. 49-5 ¶ 4.

> Paragraph 27: For an unspecified period in 2017, Assistant Special Agent in Charge #2 McDonald temporarily reassigned Knispel from his position as Chief of Police to that of Agency Special Agent. Doc. 15 ¶ 27; <u>see also</u> Doc. 49-5 ¶ 6; Doc. 61 ¶ 107 (Secretary's admission that SAC Naranjo ordered Knispel was to be given a 120-day detail to the Uintah and Ouray Agency in November of 2017).

The claims alleged in paragraphs 35 and 37 of the Amended Complaint differ in that they occurred after Knispel filed his 2018 EEO Complaint. Paragraph 35 alleges, "On August 16, 2018, [ASAC Funk] reassigned Knispel to the position of 'law enforcement vehicle transporter' in a different district," and paragraph 37 alleges, "On December 6, 2018, Knispel received a Notice of

---

[9] The Agency's Notice of Final Interview and Right to File a Discrimination Complaint states that the counseling interview occurred on December 11, 2017. <u>See</u> Doc. 69-4 at 1. For purposes of this Opinion and Order, this Court uses December 12, the date found in the Counselor's Report, Doc. 69-5.

Proposed Removal from service. Doc. 15 ¶¶ 35, 37. Again, the Secretary argues these discrete acts have not been exhausted because they "occurred after Knispel's initial visit with the EEO Counselor on October 23, 2017." Doc. 52 at 18. However, "[a] complainant may amend a complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint." 29 C.F.R. § 1614.106(d). Knispel amended his 2018 EEO complaint on August 24, 2018, to include ASAC Funk reassigning him to transport vehicles in a different district. See Doc. 49-6 at 2. The Agency added Knispel's 2018 Notice of Removal *sua sponte* during its investigation. Doc. 49-3 at 3 n.2. After finding both claims were "like or related to those claims raised in the complaint," the Agency accepted both claims prior to the conclusion of its investigation and issuance of the Final Agency Decision. See id. ¶¶ 15-16.[10]

This Court likewise finds these two claims are related to those claims Knispel raised in his 2018 EEO complaint and were properly amended under § 1614.106(d). Paragraph 35 of the amended complaint, which corresponds with claim 15 in Knispel's 2018 EEO complaint, alleges another temporary assignment was issued due to discrimination or retaliation. Viewed in the light most favorable to Knispel, this claim alleges the same conduct as a paragraph 27: Knispel was unlawfully reassigned to a new district and relegated to an inferior position within the BIA based upon discrimination and retaliation. Paragraph 37 of the amended complaint, which corresponds with claim 16 in Knispel's 2018 EEO complaint, is related to claims 2 and 5 in the EEO complaint because it is the culmination of the Internal Affairs investigation that Knispel alleged to be

---

[10] 29 C.F.R. § 1614.105(a)(2) states the 45-day deadline may be excused "for other reasons considered sufficient by the agency or the Commission." The agency's decision to add Knispel's 2018 Notice of Removal to the claims during its investigation obviates the requirement that Knispel contact the agency within the 45-day deadline and amend his own complaint to include it as part of his claims.

discriminatory. 49-3 ¶¶ 2, 5. Further, the 45-day contact requirement may be excused "for other reasons considered sufficient by the agency or the Commission." 29 C.F.R. § 1614.105(a)(2). Here, the agency found it unnecessary for Knispel to amend the complaint himself because the Notice for Removal was issued amid their investigation. The agency added the claim, investigated it, and issued a ruling on it. Thus, paragraph 37 has been properly exhausted.

Finally, the Secretary asserts that Knispel failed to exhaust paragraphs 39 and 41 of the Amended Complaint because the claims are "not provided for as part of EEO investigation." Doc. 52 at 37. The paragraphs allege:

> 39. Despite eventually receiving satisfactory Employee Performance Appraisal Plan reviews for 2017 and 2018, Knispel was denied his customary non-competitive promotion and yearly step increase which would have allowed retirement as a GS13 Step 03.
>
> . . . .
>
> 41. Knispel was placed on paid administrative leave with Law Enforcement Availability Pay from December 2018 until his retirement on December 31, 2020. This is a direct violation of Department of the Interior, Bureau of Indian Affairs policies and procedures.

Doc. 15 ¶¶ 39, 41.

"A Title VII plaintiff must file [an administrative] charge . . . before bringing a civil suit, but the scope of the subsequent action is not necessarily limited to the specific allegations in the charge." Nichols v. Am. Nat'l. Ins. Co., 154 F.3d 875, 886 (8th Cir. 1998). The United States Court of Appeals for the Eighth Circuit does "not require that subsequently-filed lawsuits mirror the administrative charges." Duncan v. Delta Consol. Indus., Inc., 371 F.3d 1020, 1025 (8th Cir. 2004), abrogated on other grounds by Torgerson, 643 F.3d 1031. However, the subsequent judicial complaint may not be broader than "the scope of the EEOC investigation which could reasonably be expected to grow out of the charge." Id. (cleaned up and citation omitted).

In Wedow v. Kansas City, the Eighth Circuit distinguished the Supreme Court's holding in Morgan, where the alleged discriminatory employment action occurred prior to the administrative charge, from discrete acts that occur after a timely filed EEOC charge. 442 F.3d at 673-74 ("Unlike allegations of a discrete act of discrimination that occurred in the past and outside of the limitations period or that occurred subsequently but were unrelated to the scope of the EEOC charges, . . . the charges filed in this case spoke of acts occurring in the present and specifically alleged future implications as well."). Subsequent acts may be considered exhausted "where the subsequent [discrete] acts were of a like kind to the [discrete] acts alleged in the EEOC charge, which were specified to be of an ongoing and continuing nature." Id. at 674; see also Ringhofer v. Mayo Clinic, Ambulance, 102 F.4th 894, 898 (8th Cir. 2024) (holding employees properly exhausted their unlawful termination claims when termination occurred after filing an administrative charge alleging the employer's vaccination policy, which allowed for employee termination, failed to accommodate their religious beliefs.)

Failure to promote and placement on administrative leave are reasonably related to Knispel's administrative charge. Knispel's 2018 EEO complaint alleged ongoing and continuing discrimination. Doc. 81-1 at 2. Both his administrative charge and his civil complaint allege that following revelation of the missing evidence in Medina, Knispel became the agency scapegoat because of his race. Specifically, Knispel alleges that he was placed under investigation and received a lower EPAP rating. Knispel then alleges that despite receiving a revised EPAP rating, he was issued a Notice of Removal, which stated he would be placed on administrative leave for 30 days. Doc. 81-1 at 47. And while the Agency was preparing the Notice of Removal, a human resources officer stated, "COP Knispel must not receive a promotion to GS 1811-13 which would be very detrimental to the pending removal action." Doc. 81-4 at 6. Thus, placement on

administrative leave and failure to promote to GS-13 were concomitant to the Notice of Removal and were within the scope of Knispel's administrative charge.

In sum, Knispel exhausted each claim alleging discrete acts of discrimination and retaliation, including a minimally successful EPAP rating, denial of leave, two reassignments, the 2018 Notice of Removal, failure to promote, placement on administrative leave, the 2020 Notice of Removal, and constructive discharge.

### 2. Acts Alleged to Contribute to a Hostile Work Environment

A charge alleging hostile work environment will not be time barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Morgan, 536 U.S. at 122. "This determination requires that [this Court] consider[s] 'whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.'" Rowe v. Hussmann Corp., 381 F.3d 775, 779 (8th Cir. 2004) (quoting Morgan, 536 U.S. at 120). Acts that are "so similar in nature, frequency, and severity must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice." Wilkie v. Dep't of Health & Hum. Servs., 638 F.3d 944, 951 (8th Cir. 2011) (cleaned up and citation omitted).

The Secretary argues paragraph 21 of Knispel's Amended Complaint is barred to the extent that it includes allegations involving supervisors who were not included in Knispel's 2018 EEO complaint. Knispel's civil complaint alleges SAC Naranjo, ASAC Kootswatewa, ASAC McDonald, and ASAC Funk "chastised, rebuffed, personally attacked, and threatened Knispel with reprimand, both verbally and via email." Doc. 15 ¶ 21. The first claim in Knispel's 2018 EEO complaint contains the same allegation but does not include either SAC Naranjo or ASAC Funk's

24

names. Doc. 49-3 at 1. The harassment Knispel alleges is essentially the same conduct for all supervisors: falsely accusing Knispel of misconduct, initiating investigations against Knispel, and disciplining Knispel disproportionately. Again, Knispel's administrative charge alleged ongoing discrimination. ASAC Funk became Knispel's direct supervisor and SAC Naranjo became Knispel's secondary supervisor on April 23, 2018, which was after the administrative complaint was filed but before the investigation was completed. Doc. 61 ¶ 12. Because Knispel alleged ongoing discrimination in his administrative complaint and because the acts concerning ASAC Funk and SAC Naranjo were subsequent to his administrative complaint and of the same nature as the allegations in his administrative complaint, the claims are "part of the same actionable hostile work environment practice" and are thus exhausted.

### B. Disparate Treatment Based on Race

Title VII prohibits the federal government from discriminating against its employees and those seeking employment based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-16. Because Knispel has not presented direct evidence to support his Title VII claims, this Court applies the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973).[11] Under the framework, the plaintiff has the initial burden to establish a prima facie case of discrimination, creating a rebuttable presumption of discrimination. Watson v. McDonough, 996 F.3d 850, 854 (8th Cir. 2021). The burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action of which the plaintiff

---

[11] Both the Secretary and Knispel move for summary judgment on this claim. Knispel relies on the McDonnell Douglas framework to create an inference of discrimination. Doc. 40. The Secretary's proffered nondiscriminatory reason raises a genuine issue of fact, making a grant of summary judgment in favor of Knispel inappropriate from the outset. This section primarily addresses Knispel's opposition to the Secretary's Motion for Summary Judgment, Doc. 41, and views the facts in the light most favorable to Knispel.

complains. Id. If the defendant does so, the burden shifts back to the plaintiff to establish the "legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Id. (quoting Tx Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 255 n.10 (1981). Notwithstanding the burden-shifting nature of the McDonnell Douglas framework, the ultimate burden of proving unlawful discrimination remains with the plaintiff. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–07 (1993).

### 1. Prima Facie Case

To establish a prima facie case of race discrimination, Knispel must demonstrate that "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination." Macklin v. FMC Transp., Inc., 815 F.3d 425, 427 (8th Cir. 2016) (citation omitted). Because Knispel is white and alleges reverse discrimination, he must also show the BIA to be "the unusual employer who discriminates against the majority" to establish the first prong of his prima facie case. McGinnis v. Union Pac. R.R., 496 F.3d 868, 875 (8th Cir. 2007).

The "threshold of proof necessary to make a prima facie case is minimal." Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1109–10 (8th Cir. 1998). The Secretary "assumes that Knispel could make the nominal showing required for the first prong of the prima facie case with respect to this specific claim" and "will concede prong two is met." Doc. 52 at 23. The parties dispute, however, whether each of Knispel's claims constitutes an adverse employment action and whether the circumstances give rise to an inference of discrimination.

"Title VII's federal-sector provision contains a broad prohibition of 'discrimination,' rather than a list of specific prohibited practices." Gomez-Perez v. Potter, 553 U.S. 474, 487 (2008) (citing 42 U.S.C. § 2000e-16). "An adverse employment action is a disadvantageous change to the compensation, terms, conditions, or privileges of employment." Cole v. Grp. Health Plan, Inc., 105 F.4th 1110, 1114 (8th Cir. 2024). Adverse employment actions include, but are not limited to, "termination, cuts in pay or benefits, and changes that affect an employe's future career prospects, as well as circumstances amounting to a constructive discharge." Jones v. City of St. Louis, 825 F.3d 476, 480 (8th Cir. 2016) (citation omitted). In Muldrow v. City of St. Louis, 601 U.S. 346 (2024), the Supreme Court nullified the Eighth Circuit's longstanding requirement that the claimed injury be significant, material, or serious. Cole, 105 F.4th at 1114 (citing Muldrow, 601 U.S. at 356 n.2).

As mentioned above, Knispel exhausted nine claims alleging discrete employment acts of discrimination, including a minimally successful EPAP rating, denial of leave, two reassignments, the 2018 Notice of Proposed Removal, failure to promote, placement on administrative leave, the 2020 Notice of Proposed Removal, and constructive discharge.[12] The Secretary contends that the lowered EPAP rating, the 2018 and 2020 Notices of Removal, and Knispel's placement on administrative leave do not constitute an adverse employment action.

An unfavorable evaluation alone is not an adverse employment action but may be actionable "where the employer subsequently uses the evaluation as a basis to detrimentally alter

---

[12] The Secretary addresses Knispel's allegations regarding "targeted investigations and threats of investigations," but Knispel does not appear to allege that the investigations themselves constituted an adverse employment action but that the resulting reassignments, notices of removal, and placement on administrative leave were adverse employment actions. See, e.g., Altonen v. City of Minneapolis, 487 F.3d 554, 560 (8th Cir. 2007) (distinguishing the investigation from "disciplinary action . . . related to the investigation.").

the terms or conditions of the recipient's employment." <u>Spears v. Mo. Dep't of Corr. & Hum.</u> <u>Res.</u>, 210 F.3d 850, 854 (8th Cir. 2000). Knispel received a "minimally successful" EPAP rating in October of 2017. Knispel's "minimally successful" rating was later amended to a fully successful rating "on or about August 14, 2018." Doc. 81-4 at 7; Doc. 61 at ¶¶ 122, 123. The Secretary contends Knispel's negative rating is not actionable because it was "cured before he filed his complaint" through the amendment. Doc. 52 at 21 (citing <u>Taylor v. Small</u>, 350 F.3d 1286, 1294 (D.C. Cir. 2003)). However, Knispel was issued two temporary duty reassignments before his 2017 EPAP was amended to a "fully successful" rating. His first reassignment to the Uintah & Ouray Agency was ordered in November 2017, less than a month after his rating was lowered. His second reassignment began in June 2018, shortly after the expiration of his first reassignment and two months before the EPAP was amended. The Secretary concedes both reassignments are adverse employment actions. <u>See</u> Doc. 52 at 27. Further, Knispel's Leave and Earning Statements (LES), Doc. 42-1, show that he remained the same pay grade and step, GS-12-03, from January 2018 through February 2021, meaning he did not receive an automatic step increase based upon time in grade after his EPAP rating was lowered. Knispel's "ineligibility for an *automatic* step salary increase based on time in grade . . . qualifies the performance rating downgrade as an adverse employment action." <u>Turner v. Gonzales</u>, 421 F.3d 688, 696 (8th Cir. 2005); <u>see also</u> 5 C.F.R. § 532.417 ("An employee paid under a regular Federal Wage System schedule with a work performance rating of satisfactory or better shall advance automatically to the next higher step within the grade . . . ."). Thus, this Court considers Knispel's "minimally successful" EPAP rating an adverse employment action to the extent it may have contributed to the two reassignments and precluded him from an automatic step increase.

28

Similarly, the Secretary argues the 2018 and 2020 Notices of Removal and accompanying placement on administrative leave were not adverse employment actions because Knispel was paid, retained his position, and ultimately retired and was not removed from federal service. Doc. 52 at 20–21. An employee placed on administrative leave pending an investigation who "maintain[s] his pay, grade, and benefits" and who is "promptly returned to his original position" generally does not suffer an adverse action. Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 891 (8th Cir. 2005). Here, however, the Notices of Removal amounted to "disadvantageous change[s] to the compensation, terms, conditions, or privileges of employment." Cole, 105 F.4th at 1114. Knispel was not "promptly returned to his original position." Singletary, 423 F.3d at 891. Instead, he remained on administrative leave for two years. During those two years, Knispel did not receive any automatic step increases. Doc. 42-1. The parties dispute whether the Notices of Removal also precluded Knispel from obtaining any promotion he might have otherwise been eligible to receive. Knispel must make a "showing that [he] would have gotten a promotion absent the [employment action]." Turner, 421 F.3d at 696. Knispel proffered correspondence from a human resources officer to Knispel's supervisors instructing them to suspend any promotions. Doc. 81-4 at 6 ("COP Knispel must not receive a promotion to GS 1811-13 . . . [A]ny promotion for which he might be currently eligible will be deferred pending the outcome of [the removal action]."). Viewed in the light most favorable to Knispel, the Notices of Removal and accompanying administrative leave "inflict[ed] direct economic harm," Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 762 (1998), because he did not receive a step increase and was barred from promotion. The fact that Knispel retained his pay while on leave does not necessarily mean the Notices of Removal were not adverse actions; instead, that matters to what damage he may have suffered. See, e.g., Ezell v. Potter, 400

F.3d 1041, 1049 (7th Cir. 2005) ("[Plaintiff's] damages may be relatively modest but the Removal Letter constituted an adverse employment action.").

Finally, to establish a prima facie case, Knispel must demonstrate that "the circumstances give rise to an inference of discrimination." Macklin, 815 F.3d at 427. "The required prima facie showing is a flexible evidentiary standard, and a plaintiff can satisfy the fourth part of the prima facie case in a variety of ways . . . ." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011) (cleaned up and citation omitted). A plaintiff might offer evidence of more favorable treatment of similarly situated employees outside the protected class, "biased comments by a decisionmaker," or "pretext with evidence that an employer 'failed to follow its own policies' or 'shifted its explanation of the employment decision.'" Grant v. City of Blytheville, 841 F.3d 767, 774 (8th Cir. 2016) (quoting Young v. Builders Steel Co., 754 F.3d 573, 578 (8th Cir. 2014)). Knispel argues the circumstances give rise to an inference of discrimination because he "was treated less favorably than similarly situated employees" and because the BIA failed to follow its own policies. Doc. 40-1 at 8, 11–12.

"To establish that a similarly situated employee not in his protected class was treated more favorably," Knispel is "required to identify an employee who was 'similarly situated in all relevant respects.'" Grant, 841 F.3d at 774 (quoting Young, 754 F.3d at 578). Knispel is unable to identify such an employee. He points to the fact that Hernandez and Martin, both of whom are Native American, were not disciplined in the same manner despite having also handled the missing evidence in the Medina case. Doc. 40-1 at 9–10. Hernandez and Martin were evidence control technicians, and Knispel outranked them and supervised them in their duties. Doc. 60-3 ¶ 27; Doc. 81-1 at 28–29. Knispel was the only Chief of Police in the WNA, and he was "responsible for directly supervising and conducting investigations into major criminal cases." Doc. 81-1 at 28.

As Chief of Police for the WNA, Knispel was essentially in a class of one. Perhaps recognizing this dilemma, Knispel points to the fact that Martin was elevated to the position of Acting Chief of Police while Knispel was on administrative leave. See Doc. 61 ¶ 63. However, Martin still does not qualify as a similarly situated employee because Martin "necessarily [held that] position after the decision at issue." Williams v. United Parcel Serv., Inc., 963 F.3d 803, 809 (8th Cir. 2020) (holding a district manager's successor was not a similarly situated employee). Finally, Knispel points to ASAC Kootswatewa, who acted as Chief of Police for the Hopi Agency in 2014. Doc. 40-1 at 8-9. Knispel proffers evidence showing that while Kootswatewa was Chief of Police for the Hopi Agency, a Corrective Action Support Team (CAST) was designated to assess agency operations and to correct deficiencies. Doc. 81-4 at 8–10. The CAST identified several deficiencies with the agency's handling of evidence. The number of official evidence control rooms was unclear, evidence in one of the control rooms was wet, and a total of 134 items were found to be missing, including money, a firearm, drugs, and alcohol. Id. at 10. Still, "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). Kootswatewa, despite holding the same position as Knispel in another agency, did not have the same supervisors as Knispel, nor did the evidence control problems at the Hopi Agency result in the dismissal of a murder charge. Knispel's conduct is further distinguished because he had also left his firearm unsecured and allegedly left a building unsecured. Because Knispel is unable to establish a similarly situated employee, he must rely on other evidence to satisfy the fourth and final element.

Knispel next argues the BIA failed to follow its policies when it did not initiate a personnel action in the Federal Personnel/Payroll System, left Knispel on administrative leave for two years

without contacting him about the matter, and revoked Knispel's supervisory authorities before the completion of the internal investigation. Doc. 40-1 at 17. And though not highlighted in Knispel's briefs, the record indicates Knispel did not receive an EPAP rating for 2019 and 2020—the two years he was on administrative leave—despite remaining employed. Knispel has not presented any evidence that it was against BIA or OJS policy to revoke Knispel's supervisory status while he was under investigation for misconduct. Instead, he merely questions the rationale and rhetorically asks, "Wouldn't it have been prudent to wait for the IAD report prior to removing a [Chief of Police]? Why weren't the procedures followed here?" Id. at 17. Knispel does not cite a specific policy or procedure, and "allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment," Thomas, 483 F.3d at 527. What remains then is whether Knispel's Notice of Removal and placement on administrative leave violated DOI or BIA policy.

The DOI's Department Manual, Doc. 68-2, states that placement on administrative leave "should only be done in the most exceptional situations, (i.e., cases involving proposed removals or indefinite suspensions)" and that "[o]nly bureau/office heads, their deputies, or the Director, OHR, may authorize the placement of an employee on administrative leave for an extended period of time (i.e., beyond 45 days)." Id. at 13. Knispel's 2018 Notice of Removal ordered him to be "placed on paid administrative leave during the 30-day notice period." Doc. 81-1 at 47. BIA policy allows for management to "amend the proposal notice (or cancel and reissue it at a later date) to allow for the consideration of any additional misconduct which becomes known to management prior to the issuance of a decision." Doc. 68-2 at 12–13. However, viewing the facts in the light most favorable to Knispel, no amendments were made. Without an amendment, BIA policy states, "The deciding official shall issue a written decision at the earliest practicable date

after receipt of the employee's answer(s), or following expiration of the 14-day answer period. The notice of decision must be delivered to the employee (or representative) at or before the time any action is to be effected." Id. at 14. The deciding official for Knispel's 2018 Notice of Removal appears to have never issued a written decision, which led to his prolonged period of administrative leave, which appears to be contrary to DOI and BIA policy.

The Secretary disputes Knispel's assertion that "placement on administrative leave for two years was inconsistent with applicable OJS personnel procedures," Doc. 61 ¶ 89, but offers no policy-based explanation for why Knispel's 2018 Notice of Removal was not acted upon "at the earliest practicable date" as set forth in the notice. Doc. 68-2 at 14. On the other hand, Knispel offers communications from BIA employees, that hint at the unusual nature of his prolonged leave period. Doc. 81-3 at 76 ("I've never in 15 years come across an employee being allowed to be on Admin Leave receiving pay for 2 years."); id. at 81 (stating Knispel has "been out for a very long time" and occupies a very critical position as Chief of Police; id. at 82 ("Has [Knispel] really been out on paid Admin Leave since December 2018?" (emphasis in original)); id. at 82 ("Son of a gun! Do you know why [redacted] was on 063 Admin leave investigation? In excess of 14 days."). This evidence satisfies the "minimal" threshold of proof required to establish a prima facie case of discrimination by disparate treatment based upon the BIA's failure to follow its own policy. Rose-Maston, 133 F.3d at 1109–10. Under the McDonnell Douglas framework, the burden shifts to the Secretary to demonstrate a legitimate, nondiscriminatory reason for the adverse actions. St. Mary's Honor Ctr., 509 U.S. at 506–07.

## 2. Defendant's Legitimate, Nondiscriminatory Reason

The Secretary raises a legitimate nondiscriminatory reason for each adverse action. Regarding Knispel's reassignments, the Secretary asserts that Knispel could not maintain a

supervisory position while he was the subject of misconduct investigations, as "the agency had an obligation . . . to ensure the safety and wellbeing of the subordinate employees of the Western Nevada Agency." Doc. 60-3 ¶ 35. The Secretary asserts that the agency issued Knispel the 2018 and 2020 Notices of Removal, which included placement on administrative leave, due to charges set forth therein: mishandling criminal evidence; careless or negligent performance of duty; conduct unbecoming of a supervisor; failure to safeguard criminal evidence; failure to safeguard government property; and failure to safeguard a government firearm. Doc. 46-1 at 1; Doc. 81-1 at 47.

Knispel argues there are "no non-discriminatory reasons for the termination." Doc. 40-1 at 18. Essentially, he argues that the facts do not support the charges in the two Notices of Removal, and therefore, the Secretary has not proffered a legitimate, nondiscriminatory reason. Id. at 18–25. However, the Secretary's "burden at this stage is a burden of production, not proof." Britton v. City of Poplar Bluff, Missouri., 244 F.3d 994, 996–97 (8th Cir. 2001) (cleaned up and citations omitted). This stage "involve[s] no credibility assessment." St. Mary's Honor Ctr., 509 U.S. at 509. The reasons the Secretary sets forth, therefore, satisfy the burden. See Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006) ("[V]iolating [an employer's] policy is a legitimate, nondiscriminatory rationale for terminating an employee.").

### 3. Evidence of Pretext

"A plaintiff generally may show that a proffered justification is pretextual in two ways." Fiero v. CSG Sys., Inc., 759 F.3d 874, 878 (8th Cir. 2014). "First, a plaintiff may rebut the factual basis underlying the employer's proffered explanation, thereby demonstrating that the explanation is unworthy of credence." Id. "Second, a plaintiff may show that the employer's proffered explanation was not the true reason for the action, but rather that the impermissible motive more

likely motivated the employer's action." Id. "In either case, the plaintiff 'must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive.'" Id. (quoting Barnhardt v. Open Harvest Coop., 742 F.3d 365, 371 (8th Cir. 2014)).

"Whereas [Knispel] need only make a minimal showing to establish the *prima facie* case, more substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the Secretary's] legitimate, non-discriminatory explanation." Jones v. United Parcel Serv., Inc., 461 F.3d 982, 992 (8th Cir. 2006) (internal citation omitted). To succeed at this stage of the McDonnell Douglas analysis, Knispel "must prove that the prohibited reason was a determinative factor" in the BIA's decisions for the adverse employment actions. Id. The Eighth Circuit has stressed that federal courts are not to act as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001) (citation omitted). "[E]mployers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices." Hervey v. Cnty. of Koochiching, 527 F.3d 711, 720 (8th Cir. 2008).

Viewing the evidence in the light most favorable to Knispel, no reasonable jury could find that the Secretary's stated reasons for disciplining Knispel were pretext for racial discrimination. After all, Knispel acknowledges that the evidence in the Medina murder case went missing and that he, as Chief of Police for the WNA, was responsible for supervising investigations. Regardless of whether he handled the evidence or directly caused it to go missing, Knispel was responsible for ensuring investigations were properly conducted and documented. Even if the evidence control technicians mishandled the evidence, Knispel, as their direct supervisor, bore some responsibility.

35

Knispel also admits to leaving his firearm unsecured in a restroom that the public could access and to calling co-workers a derogatory term after they had not lifted heavy equipment. Even if Knispel considers the BIA's decision harsh, unfair, or not aligned with standard policy, he has not shown the factual basis underlying the decision to be "unworthy of credence." Fiero, 759 F.3d at 878.

Knispel also fails to "demonstrate a causal connection between [his] protected characteristic and the employer's decision, specifically, that [his] race 'was a motivating factor' for [the BIA's] decision." Morris v. Dep't of Veterans Affs., 119 F.4th 536, 538 (8th Cir. 2024) (quoting 42 U.S.C. § 2000e-2(m)). "Evidence showing an employer has failed to follow its own policies may indicate pretext, yet an employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee as long as it does not unlawfully discriminate in doing so." Edwards v. Hiland Roberts Dairy, Co., 860 F.3d 1121, 1126–27 (8th Cir. 2017) (cleaned up). The only evidence Knispel presents to rebut the Secretary's proffered explanation is that the BIA failed to follow its policy when it did not issue a final decision or provide a new EPAP rating while Knispel was on administrative leave. Without more, that failure does not suggest Knispel's race affected the BIA's decision. See Morris, 119 F.4th at 538. "Otherwise, disappointed employees could make a Title VII case out of any bureaucratic oversight, regardless of whether that oversight had anything to do with a statutorily protected characteristic." Id. Accordingly, Knispel has failed as a matter of law to establish the justifications proffered by the Secretary are pretext for racial discrimination, and this portion of the Secretary's Motion for Summary Judgment is granted.

### C. Disparate Treatment Based on Disability

Knispel's claim of disparate treatment based on disability similarly fails because he is unable to demonstrate how his disability affected any employment decision. Under the

Rehabilitation Act, a qualified individual with a disability shall not, "solely by reason of her or his disability . . . be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). To make a claim under the Rehabilitation Act, Knispel must show he was (1) disabled, (2) otherwise qualified, and (3) the victim of discrimination solely because of his disability. Peebles v. Potter, 354 F.3d 761, 765 (8th Cir. 2004). Where no direct evidence of discrimination is available, the McDonnell Douglas framework is applied. Id. at 766. For purposes of summary judgment, the Secretary does not dispute that Knispel has a qualifying disability within the meaning of the Rehabilitation Act or that Knispel was otherwise qualified to perform the essential functions of his job. Thus, to establish a prima facie case, Knispel must only demonstrate "a causal connection between an adverse employment action and his disability." Lipp v. Cargill Meat Sols. Corp., 911 F.3d 537, 544 (8th Cir. 2018) (citation omitted).

Knispel has not presented any evidence that demonstrates he was subjected to discrimination because of his disability. Indeed, his Memorandum in Opposition to the Defendant's Motions, Doc. 60, does not reference his disability. Knispel's Amended Complaint, Doc. 15, contains two allegations expressly related to his disability, both of which are unsupported by the record. First, Knispel alleges that ASAC McDonald "denied Knispel's request to charge forty-five days of leave as part of an Office of Workers Compensation Program" (OWCP) claim. Id. ¶ 25. Next, he alleges supervisors "knew of and participated in the discrimination" based on his disability. Id. ¶ 67. The record reflects that ASAC McDonald and other supervisors became aware of Knispel's PTSD diagnosis when he filed a "claim for an occupational disease" in November 2017. Doc. 49-8 at 9. ASAC McDonald communicated with the OWCP concerning Knispel's claim and ensured Knispel completed the proper claim form. Id. at 10–17. After ASAC McDonald processed and submitted Knispel's claim to the OWCP, the OWCP notified Knispel

that his medical documentation was "insufficient to support [his] claim" in part because Knispel did not provide "a physician's opinion as to how employment activities caused, contributed to, or aggravated" his PTSD. Id. at 9.

Finally, Knispel has not provided evidence of a similarly situated employee, nor shown that the BIA failed to follow its policy, nor presented any other evidence about how his disability claim gives rise to an inference of discrimination. Because Knispel's evidence regarding his claim for disability discrimination is insufficient to establish a prima facie case, this portion of the Secretary's Motion for Summary judgment is granted.

### D. Hostile Work Environment

As a portion of his race and disability discrimination claims, Knispel alleges that the BIA subjected him to a hostile work environment through the persistent investigations and employment actions against him. Doc. 15 ¶¶ 49–73. To establish a hostile work environment claim, Knispel must prove that "(1) [he] is a member of a protected group; (2) [he] was subject to unwelcome race-based [or disability-based] harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of employment." Clay v. Credit Bureau Enters., Inc., 754 F.3d 535, 540 (8th Cir. 2014) (cleaned up and citation omitted). The BIA can be liable for harassment by Knispel's non-supervisory coworkers only if it "knew or should have known of the harassment and failed to take proper remedial action." Tatum v. City of Berkeley, 408 F.3d 543, 550 (8th Cir. 2005).

To satisfy the fourth element, Knispel must show the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted). This requires a finding that the environment was both one that "a reasonable person would find hostile

38

and one that the victim actually perceived as abusive." Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002). In determining whether a workplace is objectively hostile, courts must consider "all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 892–93 (8th Cir. 2005). "[N]o single factor is required," and it "is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22–23.

As previously noted, Knispel uses the same factual allegations to support his disparate treatment and hostile work environment claims. Beyond those previously referenced, Knispel asserts that EIC Hernandez was "always referring to race" and insinuated a non-Indian should not have been selected for his position at Western Nevada Agency, Doc. 60-3 ¶ 45, and that people within the agency would frequently make jokes about race. Id. ¶ 55 (stating he had heard jokes about "Ole and Lena, Scandinavian [descent]," about people of Polish descent, and about himself being non-Indian). This Court considers these statements and the multiple investigations, reassignments, and notices of removal in their totality.

Even when viewed in the light most favorable to Knispel, the evidence offered falls short of the standard set by the Supreme Court and Eighth Circuit to establish this sort of claim. "A hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents." Clay, 754 F.3d at 540. Additionally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (cleaned up and citations omitted).

The comments by EIC Hernandez and the jokes Knispel alludes to were not so severe and pervasive as to alter the conditions of his employment. It appears Knispel did not "actually perceive[]" the jokes "as abusive." Duncan, 300 F.3d at 934. In his deposition testimony, Knispel could not remember specifics and stated that he "[didn't] agree with them" but that he "learned to live with them." He did not "bite on things like that" because he had to "be more professional." Doc. 49-17 at 15. Regardless of Knispel's subjective belief, the jokes and comments by EIC Hernandez were not objectively hostile. The jokes, as described by Knispel, are "simple teasing, offhand comments, and isolated incidents," Faragher, 524 U.S. at 788, much of which was not even directed at him. Though the jokes may have been offensive, they do not amount to discriminatory changes in the terms and conditions of employment. The same is true with EIC Hernandez's remarks. Her statement that Knispel's position should have been filled by a Native American is an offhand comment by a non-supervisor.

Previous decisions demonstrate that Knispel has not met the standard set by the Eighth Circuit. See, e.g., Smith v. Fairview Ridges Hosp., 625 F.3d 1076, 1085–87 (8th Cir. 2010) (holding insensitive comments about racial stereotypes were of insufficient frequency and severity to constitute a hostile work environment), abrogated on other grounds by Torgerson, 643 F.3d 1031; Bainbridge, 378 F.3d at 759–60 (finding a hostile work environment claim could not be sustained where the plaintiff, whose wife was Japanese, alleged his supervisors made racially offensive remarks about Asians at least once a month for two years); Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843–44 (8th Cir. 2002) (finding that three instances where the plaintiff heard from a third party that racial epithets had been used to describe him and two instances where the plaintiff overheard coworkers use racial epithets to describe other African American employees, in addition to other "sporadic racially-motivated misconduct," could not

sustain a hostile work environment claim). Knispel's allegations consisting of only vaguely recalled jokes and one racially insensitive comment are not the kind of frequent or severe conduct that would alter the conditions of employment.

Lastly, the multiple investigations, reassignments, and employment actions do not constitute a hostile work environment because Knispel has not shown these alleged acts of harassment were based on his race or disability. See Bell v. Baptist Health, 60 F.4th 1198, 1205 (8th Cir. 2023) (requiring a genuine dispute of material fact about the causal nexus between the harassment and the protected characteristic). The investigations, reassignments, and employment actions against Knispel were all ordered by various supervisors. Knispel had not heard any of his supervisors make any jokes or statements related to his race. See Doc. 49-17 at 6–7. Likewise, he has offered no evidence showing any relation between the supervisory decisions and his disability. Knispel offers his own conclusion that the investigations, reassignments, and employment actions must constitute unlawful harassment because "never in [his] 14-year career with the Bureau of Indian Affairs or a 20-year career with the United States Department of Interior had [he] ever seen any individual that was afforded Indian preference treated in this manner or reassigned as such." Id. at 18. Knispel's perception that he was treated unfairly does not demonstrate that any of the supervisory conduct was on account of his race or disability. While being the subject of internal investigations and multiple reassignments might be frustrating, without "specific facts or evidence beyond [his] own conclusions," Knispel is unable to withstand this portion of the Secretary's Motion for Summary Judgment. Thomas, 483 F.3d at 527.

### E. Retaliation

Knispel alleges that he was retaliated against in violation of Title VII. Doc. 15 at 12. "Title VII prohibits an employer from discriminating against an employee who 'has opposed any practice

made an unlawful employment practice by this subchapter' or who 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" Barker v. Mo. Dep't of Corr., 513 F.3d 831, 834 (8th Cir. 2008) (quoting 42 U.S.C. § 2000e-3(a)).[13]  Though not expressly named under Title VII's federal employment provision, 42 U.S.C. § 2000e-16, courts have applied the prohibition against retaliation in the federal employment context. See, e.g., Fanning v. Potter, 614 F.3d 845, 849–51 (8th Cir. 2010); see also Huff v. Buttigieg, 42 F.4th 638, 646 (7th Cir. 2022) ("Under Babb and Gomez-Perez, then, we conclude that § 2000e-16 prohibits retaliation when it 'plays a part in a federal employment decision.'") (quoting Babb v. Wilkie, 589 U.S. 399, 408–409 (2020)).

Knispel may avoid summary judgment on his retaliation claim by either offering direct evidence of retaliation or using the McDonnell Douglas framework to create an inference of retaliation. Donathan v. Oakley Grain, Inc., 861 F.3d 735, 739 (8th Cir. 2017). Knispel does not argue that he has direct evidence of retaliation, and thus his claim is analyzed under the McDonnell Douglasframework.[14]  Doc. 40-1 at 21–23; Doc. 60 at 11.  Under that framework, Knispel has the initial burden of establishing a prima facie case of retaliation by showing that: (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; and (3) the adverse employment action was causally linked to the protected activity. Pye, 641 F.3d at 1021.  If Knispel establishes a prima facie case, the burden of production shifts to the Secretary to proffer "a legitimate, non-retaliatory reason for its action." Id. (citation omitted).  If the Secretary meets this

---

[13] "The two clauses of this section typically are described, respectively, as the opposition clause and the participation clause." Barker, 513 F.3d at 834 (Colloton, J., concurring).

[14] Again, because Knispel relies on the McDonnell Douglas framework to create an inference of discrimination, he cannot succeed on his own Motion for Summary Judgment, Doc. 40, under the circumstances. The Secretary's proffered non-retaliatory reason raises a genuine issue of fact, making a grant of summary judgment in favor of Knispel inappropriate. Thus, this Court focuses on the Secretary's Motion for Summary Judgment, Doc. 41, and Knispel's opposition thereto.

burden, Knispel must offer evidence that the proffered reason is pretext for the employer's action. Id. Knispel at all times retains the ultimate burden of proving his retaliation claim.[15] Donathan, 861 F.3d at 739–40.  To avoid summary judgment, Knispel needs to show evidence establishing the adverse action was "causally linked" to his protected EEO activity. Pye, 641 F.3d at 1021.

### 1. Prima Facie Case for Retaliation

Knispel engaged in protected activity beginning on October 23, 2017, when he first made contact with the Agency EEO office. He then participated in his initial interview, filed a complaint on February 9, 2018, and subsequently amended it multiple times.  The Agency's initial investigation lasted from July 2018 to March 2019.  Thereafter, the Agency conducted a supplemental investigation and issued its Supplemental Report of Investigation in April 2021. Thus, Knispel has satisfied the first prong of a retaliation claim that he engaged in protected activity.

Knispel argues the reassignments and 2018 Notice of Removal constitute adverse employment actions for his retaliation claim.  Doc. 15 ¶ 78; Doc. 40-1 at 22.  Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006).  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C.

---

[15] While the parties have not discussed the appropriate causation standard for a retaliation claim under 42 U.S.C. § 2000e-16, recent case law suggests that Title VII's provisions governing private-sector employees may be different from provisions governing the public sector.  Compare Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013) (requiring but-for causation in retaliation claims pursuant to § 2000e-3(a)), with Huff, 42 F.4th at 646 ("Under Babb and Gomez-Perez, then, we conclude that § 2000e-16 prohibits retaliation when it 'plays a part in a federal employment decision.'").

Cir. 2006)).   The Supreme Court in Muldrow nullified the Eighth Circuit's "materiality" requirement for discrimination claims, 601 U.S. 346 (2024), but the Court noted the standard still applied to retaliation claims. Id. at 357-58 ("White adopted the standard for reasons peculiar to the retaliation context."). Whether an action is material "will often depend upon the particular circumstances." White, 548 U.S. at 69.

Both the reassignments and the Notice of Removal were adverse employment actions, despite Knispel retaining his position, receiving pay, and ultimately retiring rather than being removed. First, a jury could find the various reassignment of duties required lower qualifications and were of lesser prestige. Id. at 71. For part of his reassignment, Knispel was not allowed to possess his firearm and was no longer supervising a law enforcement agency but instead transporting vehicles. Further, one reassignment required Knispel to move from western Nevada to Aberdeen, South Dakota. While the duty stations were temporary, they could be extended at the Agency's discretion. Second, the Notice of Removal constitutes an adverse action because upon its receipt, a reasonable employee would believe he will be terminated. See Wierman v. Casey's Gen. Stores, 638 F.3d 984, 999 (8th Cir. 2011) ("Unquestionably, termination is an adverse employment action."). Notice of termination, regardless of whether it comes to fruition at the end of the notice period, has a similar deterring effect as actual termination. Such action could dissuade a reasonable worker from participating in protected Title VII activity. Additionally, upon receiving the Notice of Removal, Knispel was placed on administrative leave. He was not promptly returned to his position; rather, he was on administrative leave for two years. Cf. Singletary, 423 F.3d at 891 (noting an employee placed on administrative leave who is "promptly returned to his original position" generally does not suffer an adverse action). During that time, Knispel did not receive any automatic step increases, and a human resources employee instructed

his supervisors to defer promotion to GS 1811-13 pending the outcome of the removal action. Doc. 81-4 at 6. The fact that Knispel remained employed and paid through his retirement affects what, if any, damages he suffered, but the 2018 Notice of Removal still brought about materially disadvantageous changes to his compensation, conditions, and privileges of employment. Therefore, reviewing the evidence in the light most favorable to him, Knispel has satisfied the second element of a retaliation claim that he suffered a materially adverse employment action.

To establish the final element of a retaliation claim, Knispel must demonstrate the materially adverse employment action was causally linked to his EEO activity. A causal link is "a showing that an employer's 'retaliatory motive played a part in the adverse employment action.'" Kipp v. Mo. Highway & Transp. Comm'n., 280 F.3d 893, 897 (8th Cir. 2002) (quoting Sumner v. U.S. Postal Serv., 899 F.2d 203, 208–09 (2d Cir.1990)). Knispel must offer evidence that gives rise to "an inference of retaliatory motive" on the part of the employer. Id. An inference can be drawn from the timing of the two events, but "[g]enerally, more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists." Gibson v. Concrete Equip. Co., Inc., 960 F.3d 1057, 1065 (8th Cir. 2020) (cleaned up).

Knispel has offered evidence that gives rise to an inference of retaliatory motive. Unlike his discrimination claim, which relied only on the BIA's failure to follow its own policies, Knispel has presented evidence beyond the abnormally long, two-year period of administrative leave. Knispel has shown temporal proximity between his EEO activity and the Notice of Removal and the charges it contained. Knispel initiated contact with the EEO office in October 2017. Doc. 60-3 ¶ 1; Doc. 79-2 at 2. He then filed his EEO complaint in February 2018 and subsequently amended it on May 22, August 24, and November 28, 2018. Doc 49-3 at 3. The Notice of Removal

was issued on December 6—eight days after Knispel's most recent amendment was accepted. Though it remains unclear exactly when the removal process began, the charges in the notice intersect with the allegations in Knispel's 2018 EEO Complaint, suggesting temporal proximity. See Pye, 641 F.3d at 1022 (noting summary judgment is inappropriate where "the proffered reason for termination is inextricably intertwined with the protected conduct at issue"). For example, on July 18, 2018, Knispel contacted ASAC Funk about his concerns with one reassignment. Doc. 81-3 at 79. At the beginning of August, Farbor advised Knispel's supervisory team that he had begun drafting the Notice of Removal and that Knispel should not be promoted. Doc. 81-4 at 23; Doc. 81-4 at 6. Charge 5 in the Notice of Removal states that Knispel refused to follow ASAC Funk's directive to report on August 20 for his reassignment to Aberdeen, South Dakota. Doc. 81-1 at 56. Knispel alleged this reassignment was discriminatory and retaliatory in his EEO complaint on August 22. He then reported for the assignment on August 27. Doc. 81-1 at 56. At some time between August 20 and its issuance, the Notice was updated to include Knispel's refusal to follow the order.

In addition to temporal proximity, Knispel has presented evidence that his supervisory team was both aware of and frustrated with the allegations contained in his 2018 EEO Complaint. ASAC Funk testified in his deposition that he no longer wished to supervise Knispel because he "didn't want to continue to be subjugated to [Knispel's] false accusations, statements that were not true, harassment, and comments that were not based on fact." 81-1 at 96. Additionally, after receiving an email on July 13, 2018, from Knispel expressing concern with the reassignments, ASAC Funk emailed SAC Naranjo expressing his frustration with Knispel, wherein he stated:

> I have no desire to continue as Steven Knispel's supervisor and formally request that he is removed from under my supervisory authority. . . . I have been provided directives that have placed myself at risk of personal liability, including being directed to issue a directive to TDY [(Temporary Duty Assignment)] Steven

Knispel to transfer marked law enforcement vehicles for OJS throughout the country without personal knowledge that he had his weapons removed from his care without authorization for re-issuance.

Doc. 81-3 at 78. SAC Naranjo responded on July 16, 2018, and denied ASAC Funk's request to no longer supervise Knispel. Id. at 80. Though ASAC Funk made no mention of Knispel's EEO Complaint, SAC Naranjo includes in her response, "ASAC McDonald and I are parties to other EEO matters that COP Knispel has filed prior to your arrival in District III in March 2018." Id. The frustration with and discussion of Knispel's EEO participation, coupled with the fact that the Notice of Removal was being drafted within weeks of this conversation, see Doc. 81-4 at 6 (August 9 email from Farbor), might provide sufficient evidence for a jury to find a causal link between the Notice of Removal and Knispel's protected activity. Thus, Knispel has established a prima facie case of retaliation, and the burden shifts to the Secretary to proffer a legitimate, non-retaliatory reason for the actions.

### 2. Legitimate, Non-Retaliatory Reason

The Secretary's legitimate non-retaliatory reasons are the same as those raised as nondiscriminatory reasons. Regarding Knispel's reassignments, the Secretary asserts that Knispel could not maintain a supervisory position while he was the subject of misconduct investigations and that the Agency had a need for each duty Knispel was assigned. Doc. 60-3 ¶¶ 35, 44–45. The Secretary asserts that the Agency issued Knispel the 2018 Notice of Removal due to charges set forth therein: mishandling criminal evidence; careless or negligent performance of duty; conduct unbecoming a supervisor; failure to safeguard criminal evidence; failure to safeguard government property; and failure to safeguard a government firearm. Doc. 81-1 at 47. These reasons satisfy the burden of production. See Twymon, 462 F.3d at 935 ("[V]iolating [an employer's] policy is a legitimate, nondiscriminatory rationale for terminating an employee.").

47

### 3. Evidence of Pretext

Knispel may show pretext by rebutting the factual basis underlying the Secretary's proffered explanation or by demonstrating retaliation more likely motivated the action. Fiero v. CSG Sys., Inc., 759 F.3d 874, 878 (8th Cir. 2014). Knispel must point to enough admissible evidence to raise genuine doubt as to the legitimacy of the Secretary's proffered reason. Id. As was true with Knispel's discrimination claim, this Court is not to act as a "super-personnel department[] reviewing the wisdom or fairness of the business judgments made by employers," except to the extent that those judgments are unlawful. Cronquist, 237 F.3d at 928. "The appropriate scope of an internal investigation . . . is a business judgment, and [this Court] do[es] not review the rationale behind such a decision." Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1005 (8th Cir. 2012). To prove pretext, more substantial evidence is required than to establish a prima facie case because "evidence of pretext and retaliation is viewed in light of the employer's justification." Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005) (cleaned up and citation omitted). "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." Gibson v. Am. Greetings Corp., 670 F.3d 844, 854 (8th Cir. 2012) (citation omitted). Knispel attempts to show pretext through a similarly situated employee and through the BIA's failure to follow its own policy. As discussed in his discrimination claim, Knispel is unable to provide comparator evidence of a similarly situated employee, leaving him the argument that the BIA failed to follow its own policies.

Regarding his reassignments, Knispel has not named any policy that the BIA failed to follow.[16] However, as noted in his racial discrimination claim, Knispel has pointed to evidence showing the BIA's failure to follow its policy respecting the 2018 Notice of Removal and accompanying administrative leave. The 2018 Notice of Removal states:

> The deciding official [R. Glen Melville] will give full consideration to your reply and you will receive a written decision at the earliest practicable date afterward. If you choose not to reply, a written decision will be issued as soon as practicable after expiration of the time allowed for a reply. . . . Effective immediately, you are placed on administrative leave during the 30-day notice period . . . .

Doc. 81-1 at 65. Further, the DOI's Department Manual, Doc. 68-2, states that "[a]fter issuing the notice of proposed adverse action, management can amend the proposal notice (or cancel and reissue it at a later date) to allow for the consideration of any additional misconduct which becomes known to management prior to the issuance of a decision." Id. at 12–13. Here, the Notice of Removal was not amended, and though it was eventually canceled and reissued two years later, there apparently was no additional misconduct triggering those changes. Rather, the 2018 Notice of Removal was canceled due to the "passage of time, as well as administrative issues surrounding this matter." Doc. 70-8. If policy were followed, Knispel should have been on administrative leave for the 30-day notice period. Doc. 68-2 at 13. Instead, Melville never issued a written decision, and Knispel remained on administrative leave for two years. BIA policy allowed for amendments and extensions, but Knispel's prolonged administrative leave seemed both

---

[16] In ASAC Funk's affidavit for Knispel's EEO investigation, when asked to identify the agency policy or procedure to reassign Knispel, ASAC Funk responded, "I don't know the specific name of the policy." Doc. 49-2. However, Knispel ultimately retains the burden of proving retaliatory motive through the BIA's failure to follow its policy. Donathan, 861 F.3d at 739–40. ASAC Funk's inability to recall the policy during the investigation is insufficient to show pretext. See also Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 919 (8th Cir. 2007) (noting lack of an explicit policy does not demonstrate the employer's decision to investigate and discipline the employee for his actions was pretextual).

exceptional and beyond what BIA policy countenances. Melville should have issued a written decision on Knispel's 2018 Notice of Removal "at the earliest practicable date," but instead Melville testified he did not recall ever seeing the proposed removal. Doc. 81-2 at 26-27.

Knispel has shown how abnormal it was to be placed on administrative leave for two years through statements of BIA employees. In response to a questionnaire she received during Knispel's ongoing EEO Investigation, Denise Androlia, a BIA Benefits Officer who worked on Knispel's retirement application, wrote: "I've never in 15 years come across an employee being allowed to be on Admin Leave receiving pay for 2 years." Doc. 81-3 at 76; see also id. at 81 (stating Knispel has "been out for a very long time" and occupies a very critical position as Chief of Police); id. at 82 ("Has [Knispel] really been out on paid Admin Leave since December 2018?" (emphases in original)); id. at 82 ("Son of a gun! Do you know why [redacted] was on 063 Admin leave investigation? In excess of 14 days."). Conversely, the Secretary offers no policy-based explanation for why Knispel remained on administrative leave for two years but instead states, "Time passes and a determination is made that a subsequent removal letter should be issued." Doc. 52 at 20.

While bureaucratic oversight alone is generally insufficient to maintain a claim, see Morris, 119 F.4th at 538, Knispel has shown that his supervisors were aware of and frustrated with the allegations in Knispel's EEO complaint and that one supervisor no longer wished to supervise Knispel. In this context, a reasonable jury could find that a placement on administrative leave for two years was not merely an administrative oversight. Thus, Knispel produced rebuttal evidence sufficient to raise a genuine issue of material fact concerning the BIA's proffered reasons for the 2018 Notice of Removal and accompanying administrative leave. The portion of the Secretary's Motion for Summary Judgment relating to Knispel's retaliation claim is denied.

### F. Constructive Discharge

Knispel next claims his working conditions were so intolerable that he felt pressured and compelled to resign, amounting to a constructive discharge. Doc. 15 ¶¶ 82-85. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." Pa. State Police v. Suders, 542 U.S. 129, 141 (2004). To establish a claim of constructive discharge, Knispel must show "(1) a reasonable person in [his] situation would find the working conditions intolerable, and (2) the employer intended to force [him] to quit." Bell v. Baptist Health, 60 F.4th 1198, 1203 (8th Cir. 2023). In addition to the above requirements, there is another "basic" element: Knispel "must also show that he actually resigned." Green v. Brennan, 578 U.S. 547, 555 (2016).

Knispel's constructive discharge claim fails because he did not resign. Instead, Knispel remained on paid administrative leave until he retired on December 31, 2020. Doc. 60-3 ¶¶ 11, 72; see also Doc. 15 ¶ 86. Knispel retired because he had reached the age or time served for mandatory retirement, not because of intolerable working conditions. Doc. 40-1 at 16 (stating Knispel's separation was "by mandatory retirement"); see also 5 U.S.C. § 8335(b)(1) ("A law enforcement officer. . . shall be separated from the service on the last day of the month in which that officer . . . becomes 57 years of age or completes 20 years of service if then over that age."). Since Knispel did not satisfy the basic element of actually resigning, the Secretary's Motion for Summary Judgment relating to the constructive discharge claim is granted.

## IV.    Conclusion

For the reasons explained above, it is hereby

ORDERED that the Plaintiff's Motion for Partial Summary Judgment, Doc. 40, is denied. It is further

ORDERED that the Defendant's Motion for Summary Judgment, Doc. 41, is granted in part and denied in part. The motion is granted with respect to Plaintiff's disparate treatment, hostile work environment, and constructive discharge claims, and the motion is denied with respect to Plaintiff's retaliation claim concerning the 2018 Notice of Removal and accompanying administrative leave.

DATED this _27th_ day of January, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE