UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| STEVEN R. KNISPEL,<br><br>Plaintiff,<br><br>vs.<br><br>DOUGLAS JAMES BURGUM, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR;<br><br>Defendant. | 3:21-CV-03015-RAL<br><br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

    Plaintiff Steven R. Knispel sued Douglas James Burgum, Secretary of the United States Department of the Interior (the Secretary), alleging unlawful race-based and disability-based discrimination through disparate treatment, hostile work environment, retaliation, and constructive discharge. Doc. 15. This Court ruled on the parties' cross-motions for summary judgment, Doc. 82, and granted the Secretary's motion for summary judgment on Knispel's disparate treatment, hostile work environment, and constructive discharge claims. Id. at 52. Knispel's retaliation claim concerning the 2018 Notice of Removal and accompanying administrative leave survived. Id. Knispel withdrew his demand for a jury trial, Doc. 86, and from July 8 through July 10, 2025, this Court held a court trial on the remaining claim. Doc. 99. Under Rule 52 of the Federal Rules of Civil Procedure, this Court now enters these Findings of Fact and Conclusions of Law.

1

## I.    Findings of Fact

### A. Knispel's Employment

In December of 2015, Knispel, a white, non-Indian male, began work as a Supervisory Criminal Investigator (most commonly referred to as Chief of Police or COP) for the Western Nevada Agency (WNA) of the Bureau of Indian Affairs (BIA) Office of Justice Services (OJS). Trial Ex. 1. Knispel previously had worked as District Captain for BIA OJS in Phoenix, as a Police Lieutenant for the BIA at the Wind River Agency in Wyoming, and as a police officer for the BIA in Arizona, as well as holding positions for the National Park Service, Bureau of Reclamation, and Internal Revenue Service dating back to 1992. Tr. Ex. 263. Knispel had some basic training in evidence collection and preservation, though had never worked as an evidence technician. As COP, Knispel was responsible for supervising and at times conducting certain criminal investigations throughout the WNA, as well as supervising employees working in law enforcement in the WNA. Tr. Ex. 244. Knispel's responsibilities included administrative duties such as recommending program policy, developing the program budget, training employees, and ensuring BIA policy and procedure were followed. Id. Within the WNA, BIA OJS provides law enforcement services to 10 tribes.[1]

### B. Initial Investigations of Misconduct

Knispel's term as COP began on December 13, 2015, at a time when the WNA was understaffed. Shortly after Knispel's first week on site, Rafael Alfonso Medina, Jr. on January 1, 2016, allegedly stabbed his father to death on the Lovelock Indian Colony, and the WNA was

---

[1] The WNA provides direct law enforcement services to the Winnemucca Indian Colony, the Fort McDermitt Paiute and Shoshone Tribe, and the Summit Lake Paiute Tribe. The WNA provides supplemental services to the other seven tribes.

2

tasked with investigating that apparent homicide. See United States v. Medina, 3:16-CR-00009-LRH-WGC (D. Nev. 2016).

During his time as COP, Knispel was the subject of multiple Internal Affairs Division (IAD) investigations for alleged misconduct. The first investigation related to Knispel's use of a government vehicle to move to Nevada as COP in 2015. Knispel between December 11 and 12, 2015, used a government vehicle to haul a personal trailer with his belongings from South Dakota to his new duty station in Carson City, Nevada. Tr. Ex. 227. Knispel did not receive permission to use the government vehicle in this manner. Knispel maintains that he saved the government money by doing so.

The second investigation involved a construction project at Ft. McDermitt where Knispel on May 11, 2016, hired a private contractor to install a handicap ramp in the building. Due to the cost, the project required a service contract. Knispel, however, made an agreement and paid for the project with a credit card, circumventing the acquisition regulations. Tr. Ex. 221 at 13. Knispel did not benefit financially from this transaction.

The third investigation followed an altercation on September 13, 2016, between Knispel and Special Agent Marla "Molly" Hernandez, a police officer and evidence control technician for the WNA. Knispel had not been getting along with his administrative assistant, Crucita Guydeilthkon (Crucita) and had slammed his door so hard on September 9 after being agitated with Crucita that wall panels fell. Tr. Ex. 221 at 13. On September 13, Knispel wanted to meet with Crucita separately. Crucita asked Hernandez to join the meeting as a witness and as her representative. Knispel asked Hernandez to leave his meeting with Crucita, and Hernandez refused, leading to a verbal confrontation during which Knispel stood up, raised his voice, and placed his right hand on his duty weapon. Knispel testified that he was employing a law

3

enforcement technique of taking his voice one range higher than Hernandez to gain control and that he rested his hand on his duty weapon merely by habit and not consciously. Hernandez contacted the Sheriffs' office which responded, and the superintendent had the Agency facility evacuated for the remainder of the day. Crucita thereafter filed an Equal Employment Opportunity (EEO) complaint for hostile work environment, and as part of a settlement, Lieutenant Derek Martin replaced Knispel as her supervisor. Tr. Ex. 221 at 13–14.

All three of these IAD investigations were sustained. See Tr. Ex. 21; Tr. Ex. 221. Assistant Special Agent in Charge (ASAC) Clinton Funk, who would later supervise Knispel, worked within the IAD at this time and determined that the findings should be sustained. Given the findings, Knispel was to receive a decrease in grade. See Tr. Ex. 21. However, as investigation into the mishandled Medina evidence ensued, Knispel would later receive a Notice of Removal from Federal Service in 2018 (2018 Notice of Removal).

### C. Mishandled Evidence in Medina and Subsequent Investigations

On February 17, 2016, Medina was indicted in the District of Nevada on one count of Murder within Indian Country for the death of his father. Two years after the indictment, on February 28, 2018, a federal district court dismissed the murder charge in Medina because the WNA "lost or mishandled the majority of evidence obtained during the murder investigation." Tr. Ex. 213 at 3; see also Tr. Ex. 228 at USA020440–67. The WNA, which was under Knispel's supervision as COP throughout the time, was responsible for managing evidence from the crime scene. During the initial stages of the investigation, Hernandez, as evidence control technician for WNA, managed the Evidence Control Program. As part of the WNA's investigation, Hernandez conducted multiple interviews and was to maintain the audio recordings of them. Hernandez resigned from her position as evidence control technician in October 2016 and subsequently

4

to McDermitt on May 4, 2017. The cargo trailer sat loaded outside of the McDermitt facility for two months, but Knispel viewed the evidence as secure because the cargo trailer remained locked.

Knispel believed that there was nothing of evidentiary value inside of the evidence refrigerator left behind in Carson City. On June 21, 2017, he had a locksmith make him an extra key for the exterior door, but did not have keys for any interior compartment, which were with Martin. On July 25, 2017, Knispel asked Martin to bring a horse trailer from McDermitt to transport the safes and evidence refrigerator that remained in Carson City. Knispel had the safes emptied of drugs, currency, guns and ammunition, and believed the refrigerator to contain old forensic kits not of evidentiary value. Knispel, together with a corrections officer and a non-federal employee, loaded the safes and refrigerator into the horse trailer. Knispel towed the horse trailer containing six industrial safes and an evidence fridge on July 25 to the Lovelock police station and parked it there. Knispel testified that the cargo trailer that Martin transported contained the Medina evidence and that the horse trailer did not contain any evidence from the Medina case. Knispel later moved the horse trailer to Winnemucca. On August 22, 2017, BIA Special Agent Blaine Parnell arrived at WNA on a temporary detail and learned from Martin about evidence storage practices after the Carson City evidence control room closure. On September 12, 2017, with the horse trailer now in McDermitt, Parnell at Knispel's instruction was attempting to remove the safes and refrigerator from the horse trailer. After learning that Parnell and other subordinate employees were unable to lift the safes and refrigerators, Knispel sent a text message calling them "pussies." Tr. Ex. 228.

Shortly after the move was completed, Knispel had been in the McDermitt Substation with two tribal members who were parties to criminal investigations. The tribal members were captured on video surveillance engaging in horseplay with police equipment. The door to the McDermitt

6

Substation had been left open, leaving records and personally identifiable information at risk, though it appears that no such records were taken. Knispel questions that he was the one to leave the door open and was critical of the locking mechanism.

On August 30, 2017, an attorney prosecuting the Medina case notified Knispel that at least a dozen recorded interviews were missing. Tr. Ex. 248. Knispel responded on September 15, 2017, detailing the efforts his agency undertook to locate the evidence but without success. Id. On September 27, 2017, the BIA issued a Serious Incident Report regarding the missing recordings. Tr. Ex. 31. In addition to the recorded interviews, physical and biological evidence was also missing or destroyed. On December 9, 2017, the United States Attorney's office filed a memorandum in Medina detailing Special Agent Parnell's investigation of the WNA's Evidence Control Program and the status of the missing evidence. Medina, 3:16-CR-00009-LRH-WGC (No. 34-1). Ultimately, the evidence was not located, and as a result, the court dismissed the murder charge on February 28, 2018. Id., 2018 WL 1125590, at *2 (D. Nev. Mar. 1, 2018) ("Based on the loss of the murder evidence, the government concedes that trying the murder charge would violate Medina's due process rights. The court agrees and dismisses the murder charge accordingly."); Tr. Ex. 213.

Because of the WNA's mishandling of the evidence, the United States Attorney's Office for the District of Nevada did not want the WNA to investigate federal criminal cases, leaving the FBI to manage federal criminal investigations within the WNA. See Tr. Ex. 273. The Medina case was the only federal prosecution brought based on the WNA's investigatory work during Knispel's time as COP. Whether right or wrong to blame Knispel, the assistant United States Attorney on the Medina case described "Chief Knispel's management style as 'cavalier' and as

someone who believes that since they are the boss and can do what they want to do." Tr. Ex. 228 at USA 020339.

The IAD investigated the mishandling of evidence and Knispel's discourteous conduct towards his subordinates during the move. Tr. Ex. 228. The IAD did not investigate Hernandez or Martin. The IAD investigation found that Knispel called employees "pussies" via text message and that Knispel did not complete evidence chain of custody forms or an inventory when he removed evidence from the WNA evidence control room in Carson City and transported it to the McDermitt Substation. Id. The IAD concluded biological evidence in Medina was lost during Knispel's relocation of the evidence control room, stating in part:

Based on witness statements, federal court orders, and federal court motion to dismiss orders, witness interview statements as evidence was lost as a result of being removed from the WNA ECR which was later relocated to the Ft. McDermitt Substation. The federal murder charge was dismissed in federal court due to the mishandling of this evidence.

Id. However, the report included a somewhat contradictory statement from Parnell that a blood sample was destroyed "during the testing with the Washoe County Crime Lab" rather than during the move. Id. Knispel maintained throughout and testified that his subordinates Hernandez or Martin were to blame for any evidence mishandling and that the refrigerator he moved did not contain biological evidence from the Medina case because such evidence was at the lab.

On October 6, 2017, shortly after the IAD began investigating Knispel's alleged evidence mishandling and discourteous conduct, Knispel left his government-issued firearm unsecured on a toilet paper dispenser in a restroom of a government building. This building was accessible to other BIA employees, visitors, and members of the public. Tr. Ex. 221. Parnell, a fellow officer, found the firearm and returned it to Knispel. Further investigation revealed that Knispel previously had left his firearm unattended in a restroom when he worked in Pine Ridge. Knispel testified that

8

the bathroom was infrequently used by visitors or the public and that the firearm was left unattended only ten minutes.

### D. Employment Actions and EEO Activity

While under investigation, Knispel was subject to several employment actions, including changes in his Employee Performance Appraisal Plan, reassignment of duties, and placement on administrative leave. Believing he was being treated differently because of his race and disability, Knispel contacted the agency's Equal Employment Opportunity (EEO) department.

In October 2017, ASAC Jamie Kootswatewa, Knispel's first-line supervisor from summer of 2017 to November 2017, rated Knispel "minimally successful" on his 2017 Employee Performance Appraisal Plan (EPAP). Tr. Ex. 92. Critical Element 3 of the EPAP included the stated strategic goal that Knispel "[s]afeguards lives, property and assets," and ASAC Kootswatewa's rating noted that "Knispel is a highly motivated Chief of Police" but that the "recent movement of the evidence room including questionable consequences with regard to the integrity of the evidence is an on going [sic] issue." Id. On October 23, 2017, Knispel made initial contact with the Agency EEO Office. Tr. Ex. 37; Tr. Ex. 298. In his request to speak to an EEO counselor, Knispel cited "a progressively worsening work environment" within his district's OJS supervisory team. Tr. Ex. 37. His supervisory team at that time included ASAC Selanhoongva McDonald, ASAC Kootswatewa, and Special Agent in Charge (SAC) Laura Naranjo. Knispel met with an EEO Counselor on October 25, 2017, to discuss the alleged issues. Two weeks later, Knispel's supervisory team contacted Barry Farbro, a human resources specialist within the BIA, to ask whether they could reassign Knispel to another duty station despite Knispel holding a supervisory position. Tr. Ex. 45. Farbro responded that the proposed actions were acceptable. Id.

9

On December 12, Knispel participated in an initial interview with the EEO Counselor. Tr. Ex. 298.

From December 2017 to March 2018, Knispel went on leave for PTSD treatment. Knispel attributed his PTSD diagnosis to the volume of work as COP in the WNA and pressure and anxiety he felt from the district office. While on PTSD-related leave, Knispel was required to turn in his government-issued equipment, including his firearm, laptop computer, and vehicle. He also lost access to his government email or to WNA facilities. Knispel learned his access was removed because he would be on leave for more than 30 days. Knispel found these restrictions strange, since in 2012 he was on extended leave for cancer treatment and retained his government-issued property. On February 9, 2018, Knispel filed a formal complaint under Title VII and the Rehabilitation Act with the EEO department. Tr. Ex. 298.

When Knispel returned to the WNA in March 2018, his role changed. He no longer had supervisory authority but retained his title, grade, and pay. His government-issued firearm was not immediately returned to him. Martin had become and remained Acting Chief of Police. ASAC Funk became Knispel's supervisor on March 19, 2018, but Knispel received no clear directives on what he was to do now that his own supervisory authority was removed. Knispel performed office work, took phone calls, and completed other light duties.

On May 21, 2018, Knispel and ASAC Funk received an email from Barry Farbro, a human resources specialist within the BIA, indicating Knispel was clear to return to his position as Chief of Police. Tr. Ex. 68. ASAC Funk relayed the message to SAC Naranjo and ASAC McDonald asking for direction as to whether to reinstall Knispel as COP. Id. The next day, Knispel amended his EEO complaint to include discussions of office relocation that had transpired earlier in the

10

month. Tr. Ex. 212. Knispel was not reinstated as Chief of Police and continued performing light office work through July 2018.

On June 25, 2018, ASAC Funk notified Knispel of a temporary duty assignment with the Uintah & Ouray Adult Detention Facility for inmate management, prisoner transports, medical and meal distribution, and control panel operation for 30 days. Tr. Ex. 85. While at this duty station, Knispel retained his grade, salary, and title of Chief of Police for WNA. Id. The notice stated the temporary assignment was based on "current staffing and operational needs of BIA OJS." Id. at 2. The notice also referenced the IAD's investigation into "reported incidents of alleged misconduct for which disciplinary action may be proposed in the future." Id. This temporary duty assignment was not to exceed 30 calendar days and was to automatically expire on July 24, 2018. Id. at 1.

Knispel then was temporarily reassigned to transport vehicles from Albuquerque, New Mexico, to North Dakota and South Dakota. Knispel expressed concerns to his supervisory team about the reassignments because they required him to operate a marked law enforcement vehicle without his assigned duty weapon, which he felt placed him in danger and placed the government at risk of liability. Knispel also felt the temporary assignments were degrading, since these duties were usually performed by someone at a much lower pay grade and Knispel received four times the pay as the typical employee performing those duties.

ASAC Funk forwarded Knispel's concern to Knispel's second-line supervisor SAC Naranjo and stated:

> I [(ASAC Funk)] have been provided directives that have placed myself at risk of personal liability, including being directed to issue a directive to TDY [(Temporary Duty Assignment)] Steven Knispel to transfer marked law enforcement vehicles for OJS throughout the country without personal knowledge that he had his weapons removed from his care without authorization for re-issuance.

11

Tr. Ex. 282.  Funk's email expressed he no longer wished to supervise Knispel, citing the "numerous historically adversarial supervisory situations."  Id.  SAC Naranjo responded on July 16, 2018:

> You are performing your duties in consultation with HR for their expertise.  You are following their guidance.  Please continue doing so as you continue supervising COP Knispel, and as you are with the other COP's [sic] under your supervision.  All you can do is take one matter or topic at a time and address it accordingly.  As it appears you have been doing correctly.  In close dialogue with HR experts to ensure proper procedures.
>
> ASAC McDonald and I are parties to other EEO matters that COP Knispel has filed prior to your arrival in District III in March 2018.

Id.  ASAC Funk remained Knispel's supervisor and shortly after ensured Knispel was reissued his firearm for the temporary duty assignments.

Knispel was set to return to his duty station on August 8, 2018.  Tr. Ex. 104.  ASAC Funk and SAC Naranjo sought to reassign Knispel to other Districts within BIA OJS upon his return.  Id.  When Knispel returned on August 8, ASAC Funk changed Knispel's 2017 EPAP rating from "minimally successful" to "fully successful."  Tr. Ex. 298.  ASAC Funk testified that Knispel had not received the requisite prior notice of the possible "minimally successful" rating from ASAC Kootswatewa earlier in the review period prior to issuing such a rating, so Knispel's "minimally successful" rating was thereby upgraded.

On August 16, 2018, ASAC Funk, reassigned Knispel to the BIA OJS District I in Aberdeen, South Dakota.  This detail's duties included transporting law enforcement and corrections government-owned vehicles over long distances throughout the United States.  Knispel amended his EEO complaint a second time on August 24, 2018, to include the July and August reassignments.  Tr. Ex. 211.  Knispel amended his EEO complaint a third time on November 28,

2018, to include instances where he did not receive travel vouchers and for inquiries made into fleet services staff from a BIA OJS Vehicle. Tr. Ex. 210.

### E.  2018 Notice of Removal and Accompanying Administrative Leave

The exact date the decision was made to issue Knispel a Notice of Removal is unclear. However, communications between human resource officials and Knispel's supervisory team indicate that a decision was made in or prior to July 2018 and followed completion of the IAD reports. See Tr. Ex. 104. The process for issuing a notice of removal took considerable time because the notice needed review from the human resources and the solicitor's offices. Knispel was not eligible to receive a promotion while the Notice of Removal was being drafted and finalized. Tr. Ex. 113. ASAC Funk, whom this Court finds to be a credible witness, testified that Knispel's EEO activity had no impact on the 2018 Notice of Removal or grounds cited therein.

ASAC Funk issued Knispel the 2018 Notice of Removal on December 6. Tr. Ex. 221. The Notice cited five charges: (1) discourteous conduct; (2) careless or negligent performance of duty; (3) failure to safeguard criminal evidence; (4) inability to perform full range of duties; and (5) disregard of a supervisory directive. Id. The Notice further provided: "Effective immediately, you are placed on paid administrative leave during the 30-day notice period[,] and you are directed to surrender your government-owned property and equipment and exit the federal work place." Id. Knispel was not allowed to report for work at BIA OJS unless "specifically approved or directed by [ASAC Funk] or another supervisor in [his] chain of command." Id.

Richard Melville was designated the deciding official concerning Knispel's removal. Id. At the time the 2018 Notice of Removal was issued, Melville was the Deputy Associate Director for the Field Operations Division. As Deputy Associate Director, Melville was the direct supervisor of the Special Agents in Charge in WNA. Knispel had the opportunity to respond to

the 2018 Notice of Removal, and Melville was to "give full consideration to [Knispel's] reply and [issue] a written decision at the earliest practicable date afterward." Id. If Knispel elected not to reply, a written decision was to be issued "as soon as practicable after expiration of the time allowed for a reply." Id. The 2018 Notice of Removal further specified, "If sustained by the deciding official, the proposed action will not be effective earlier than 30 calendar days from the date you receive this letter." Id. Knispel never received a written decision on the 2018 Notice of Removal but rather began a prolonged period on administrative leave.

Despite being named the deciding official, Melville had no recollection of seeing the proposed disciplinary action. Unaware of or perhaps neglecting the 2018 Notice of Removal, Melville never issued a written decision, causing Knispel to remain on administrative leave for over a year without any contact from his chain of command. Knispel remained on the payroll while on administrative leave, and his retirement, health benefits, and salary did not change. Knispel claims that the absence of a final decision caused him stress, as he was unsure if he would be paid during the next pay period, and he was unable to secure outside employment while employed with the federal government. The pending disciplinary action also prevented him from receiving a step increase or promotion within BIA OJS. Knispel hoped that when he reached mandatory retirement age, he would be eligible for a position with the Federal Law Enforcement Training Center (FLETC) as an instructor.

DOI policy states, "Administrative leave should only be used in the most exceptional situations when other options are considered impractical." Tr. Ex. 222. An employee will normally "remain in an active duty status" while under investigation or during a notice period for actions related to misconduct. Id. However, in certain "rare instances," including removal actions, the proposing official may determine that "the employee's continued presence at the workplace

14

may . . . jeopardize legitimate Government interests" and "place the employee in an administrative leave status for such time as necessary to make a decision and effect an action." Id. The 2018 Notice of Removal established a 30-day notice period, during which Knispel was to be on administrative leave. Tr. Ex. 221. Its terms demonstrate that ASAC Funk as proposing official determined that Knispel should not retain active status for a 30-day period given the sustained IAD investigations and the charges contained within the proposed removal.

Under BIA OJS policy, "[o]ffices have the discretion to place an employee on administrative leave up to 14 calendar days." Id. However, the Office Director must submit a signed memorandum to the Office of Human Resources requesting any leave beyond 14 days. Id. "Memorandums must clearly state why the employee was put on administrative leave, the reasons why the extension should be approved, and the estimated number of days the employee will be on administrative leave." Id. The policy states that at a minimum the submission to the Office of Human Resources should address:

- How did you reach the conclusion that the presence of the employee in the workplace may be injurious to the employee or to others, may result in loss of or damage to Government property, or may otherwise jeopardize legitimate Government interests.
- Describe why no other work alternatives, other than placing the employee on administrative leave, would be appropriate in this circumstance.
- In your consultation, please describe the Office of the Solicitor's recommendations in support of your extension request.

Id. The policy further states, "Memoranda should be initiated as soon as it appears that the employee will be placed on administrative leave longer than 14 calendar days." Id. BIA OJS neglected its policy in allowing Knispel's leave to endure. ASAC Funk testified that the Office of Human Capital was to make requests to extend administrative leave, and that he did not contact Knispel during his time on administrative leave but continued to approve Knispel's pay while the proposed removal remained pending.

15

Knispel remained on administrative leave throughout all of 2019 pending a final decision. Knispel on February 14, 2020, sent an email message to the BIA about being on paid administrative leave since December 2018 and his approaching mandatory retirement in December of 2020. Tr. Ex. 124. This email triggered a surprised reaction from the BIA official who received it about such an extended paid administrative leave. Another BIA official testified that, while peculiar, such instances of extended administrative leave have occurred notwithstanding DOI policy to the contrary.

On March 10, 2020, Melville issued a Rescission of Proposal to Remove, revoking the 2018 Notice of Removal "due to the passage of time, as well as administrative issues surrounding this matter." That same day, Melville issued Knispel a second Notice of Removal (2020 Notice of Removal). Tr. Ex. 245. Melville believed he was selected as the proposing official for the 2020 Notice of Removal because by that time he was the only person left in OJS within the chain of command as Knispel's supervisor of record. As Knispel's third-line supervisor, he did not recall many details and was unsure what administrative issues warranted rescinding the 2018 Notice of Removal. He felt it improper for the BIA to pay an employee for two years while on administrative leave. Melville testified that he acted upon the advice of the human resource and the solicitor's offices when deciding to rescind and reissue the Notice of Removal. Nothing in Melville's testimony suggests that Knispel's EEO activity factored in these decisions.

The 2020 Notice of Removal contained six charges: (1) Mishandling of Criminal Evidence; (2) Careless or Negligent Performance of Duty; (3) Conduct Unbecoming a Supervisor; (4) Failure to Safeguard Criminal Evidence; (5) Failure to Safeguard a Government Facility; and (6) Failure to Safeguard Your Government Firearm. Tr. Ex. 245. The first five charges contain the same factual bases as the charges articulated in 2018 Notice of Removal. The sixth charge had

previously been incorporated in the 2018 Notice of Removal as Specification D of Charge 2 "Careless or Negligent Performance of Duty." Compare Tr. Ex. 245, with Tr. Ex. 221.

The deciding official for the 2020 Notice of Removal was Timothy LaPointe, the Regional Director of the Great Plains Region for the BIA. Tr. Ex. 245. LaPointe interviewed Knispel and found Knispel failed to take accountability and instead blamed others for the charges. On November 30, 2020, LaPointe issued a Decision to Remove, effectively terminating Knispel from federal employment. Tr. Ex. 223. LaPointe's Decision of Removal sustained all six charges from the Notice of Removal, finding each charge was "fully supported by the record." Id. LaPointe testified that he found some of the facts to be jarring, particularly the missing evidence that resulted in the dismissal of a murder charge while Knispel was COP and Knispel leaving his firearm unattended. Nothing in LaPointe's testimony suggested that Knispel's EEO activity had any effect on LaPointe's decision.

Even yet, Knispel was not removed on December 1, 2020, following the Decision to Remove. Rather, Knispel remained on paid administrative leave until his mandatory retirement on December 31, 2020. See Tr. Ex. 205. Following his retirement from federal services, Knispel worked on the construction of a homeless shelter on the Rosebud Indian Reservation and briefly worked for the Ogalala Sioux Tribe as law enforcement technical support. He then formed Bad Lands Public Safety and Contracting, LLC, a company that contracts with United States Postal Service for mail delivery and that appears to be a very profitable business for Knispel.

This Court makes additional findings of fact in Part II.B to apply the law to the facts.

## II.    Conclusions of Law and Findings of Fact Relating to Legal Requirements

### A. Title VII Claim Elements

Title VII requires "all personnel actions affecting employees" in federal agencies to "be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. Though not expressly named under Title VII's federal employment provision, courts have applied the prohibition against retaliation in the federal employment context. See, e.g., Fanning v. Potter, 614 F.3d 845, 849–51 (8th Cir. 2010); see also Green v. Brennan, 578 U.S. 547, 551 n.1 (2016) ("We assume without deciding that it is unlawful for a federal agency to retaliate against a civil servant for complaining of discrimination.").

To succeed on a claim for unlawful retaliation under 42 U.S.C. § 2000e-16, Knispel must prove by a preponderance of the evidence (1) that he engaged in protected activity; (2) that he suffered an adverse employment action; (3) that the adverse action would dissuade a reasonable employee in the same or similar circumstances from engaging in the protected activity; and (4) that Knispel's engagement in protected activity played a part in the employment decision.[2]

As to elements two and three, the Supreme Court in Muldrow v. St. Louis, 601 U.S. 346 (2024) nullified the Eighth Circuit's "materiality" requirement for discrimination claims, but the Court noted the standard still applies to retaliation claims. Id. at 357-58 ("White adopted the standard for reasons peculiar to the retaliation context."). A materially adverse employment action is one that would "deter[] a reasonable employee from engaging in protected activity." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007). Whether an action is material

---

[2] This Court applied the familiar McDonnell-Douglas rubric when ruling on the cross-motions for summary judgment but references the elements of a retaliation claim here. The same facts applied to the McDonnell-Douglas test would yield the same result.

18

"will often depend upon the particular circumstances." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69 (2006).

As to element four, under the private employer provision of Title VII and under § 1981, a plaintiff must prove that the engagement in a protected activity is the *but-for cause* of the adverse employment action. Warren v. Kemp, 79 F.4th 967, 973 (8th Cir. 2023). However, recent case law suggests that Title VII's provisions governing the federal public sector establishes a lower causal standard. Compare Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013) (requiring but-for causation in retaliation claims pursuant to § 2000e-3(a)), with Huff v. Buttigieg, 42 F.4th 638, 646 (7th Cir. 2022) ("Under Babb and Gomez-Perez, then, we conclude that § 2000e-16 prohibits retaliation when it 'plays a part in a federal employment decision.'") (quoting Babb v. Wilkie, 589 U.S. 399, 408–409 (2020)); see also Buckley v. Sec'y of Army, 97 F.4th 784 (11th Cir. 2024) (holding § 2000e-16 prohibits "retaliation in the decision-making process—even if it didn't affect the ultimate decision").

This Court may infer retaliatory motive from the timing of EEO activity and the employment actions, but "[g]enerally, more than a temporal connection between protected activity and an adverse employment action is required to show a genuine factual issue on retaliation exists." Gibson v. Concrete Equip. Co., Inc., 960 F.3d 1057, 1065 (8th Cir. 2020) (cleaned up). A court may also find that a plaintiff's protected activity played a part in the employment decisions if it finds that any proffered explanation by the employer is pretextual. See Moore v. Robertson Fire Prot. Dist., 249 F.3d 786, 790, n.9 (8th Cir. 2001). To show pretext, a plaintiff "may rebut the factual basis underlying the employer's proffered explanation, thereby demonstrating that the explanation is unworthy of credence." Fiero v. CSG Sys., Inc., 759 F.3d 874, 878 (8th Cir. 2014). A plaintiff may also show "that an employer (1) failed to follow its own policies, (2) treated

19

similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." Gibson v. Am. Greetings Corp., 670 F.3d 844, 854 (8th Cir. 2012) (citation omitted).

When evaluating employment decisions, federal courts are not to act as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers," except to the extent that those judgments are unlawful. Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001) (citation omitted). "[E]mployers are free to make employment decisions based upon mistaken evaluations, personal conflicts between employees, or even unsound business practices." Hervey v. Cnty. of Koochiching, 527 F.3d 711, 720 (8th Cir. 2008). On its own, evidence of an employer's failure to follow policy generally cannot maintain a claim under Title VII. See Morris v. Dep't of Veterans Affs., 119 F.4th 536, 538 (8th Cir. 2024). "Otherwise, disappointed employees could make a Title VII case out of any bureaucratic oversight, regardless of whether that oversight had anything to do with a statutorily protected characteristic." Id. To establish that a similarly situated employee not in his protected class was treated more favorably," a plaintiff is "required to identify an employee who was 'similarly situated in all relevant respects.'" Grant v. City of Blytheville, 841 F.3d 767, 774 (8th Cir. 2016) (quoting Young v. Builders Steel Co., 754 F.3d 573, 578 (8th Cir. 2014)).

### B. Additional Findings of Fact on Title VII Elements and Claim[3]

Knispel has proven the first three elements on a Title VII retaliation claim. He repeatedly engaged in protected activity when he contacted the EEO department, filed a complaint, and

---

[3] Though this section contains findings of fact in applying facts to the law set forth above, this Court cites to case law where helpful. If anything set forth in this section is mischaracterized as a finding of fact and actually is a conclusion of law, it then should be deemed incorporated in the conclusions of law in Part II.A.

amended his complaint multiple times. See Gilooly v. Mo. Dep't of Health & Senior Servs., 421 F.3d 734, 742 (8th Cir. 2005) (Colloton, J., concurring) (discussing the "participation clause" under § 2000e-3). And despite Knispel retaining his position, receiving pay, and ultimately retiring rather than being removed, the "minimally successful" 2017 EPAP rating, the reassignments, and the two Notices of Removal were adverse employment actions that could dissuade a reasonable employee in the same or similar circumstances from engaging in the protected activity.

The "minimally successful" EPAP rating prevented him from receiving an automatic step increase based upon time in grade, and such "ineligibility for an *automatic* step salary increase based on time in grade . . . qualifies the performance rating downgrade as an adverse employment action." Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005); see also 5 C.F.R. § 532.417 ("An employee paid under a regular Federal Wage System schedule with a work performance rating of satisfactory or better shall advance automatically to the next higher step within the grade . . . ."). The various reassignments were of lesser prestige and required Knispel to leave his home for extended periods and thus, especially considered cumulatively, would dissuade a reasonable worker from participating in protected Title VII activity. See Quinn v. St. Louis Cnty., 653 F.3d 745, 751 (8th Cir. 2011) (noting "[t]he materially adverse employment action element may be met by an employer's single act . . . [or] by the 'cumulative effect' of an employer's alleged retaliatory conduct" (citations omitted)).

The Notices of Removal constitute adverse actions because upon receipt, a reasonable employee would believe he will be terminated. See Wierman v. Casey's Gen. Stores, 638 F.3d 984, 999 (8th Cir. 2011) ("Unquestionably, termination is an adverse employment action."). Notice of termination, even if it is not effectuated at the end of the notice period, has a similar deterring effect to actual termination. Further, the accompanying administrative leave precluded

21

Knispel from receiving automatic step increases, and a human resources employee instructed his supervisors to defer promotion to GS 1811-13 pending the outcome of the removal action.

At trial, Knispel sought to prove the final element—that his participation in the EEO process played a part in the employment decisions—by offering evidence of (1) temporal proximity between his EEO activity and the adverse actions and that (2) the Secretary's proffered non-retaliatory explanation for the reassignments and the Notices of Removal were pretextual.

Here, temporal proximity existed between Knispel's protected activity and the lowered EPAP rating, the reassignments, and the Notice of Removal. However, this Court finds the proximity does not establish retaliatory motive, especially when multiple IAD investigations had found misconduct triggering consideration of disciplinary action prior to any EEO action by Knispel. Three early investigations into alleged misconduct—unauthorized use of his government vehicle, misuse of funds for the handicap ramp, and the confrontation with Hernandez—were sustained, and human resources was drafting a proposed demotion action in September of 2017. Knispel did not initiate contact with the EEO department until October 23, 2017. While the proposed demotion never occurred, ASAC Funk credibly testified that it was deferred pending investigation into subsequent misconduct. The IAD investigation for evidence mishandling and discourteous conduct began on September 22, 2017, one month before Knispel filed a complaint with the EEO department. Tr. Ex. 228. The IAD investigation closed on April 24, 2018, and the IAD Report was issued on May 7, 2018. Id. Due to the severity of the accusations, Knispel's supervisory authority was revoked during the IAD investigation, and Knispel's chain of command began seeking reassignments for him. Notably, his chain of command sought the advice of human resources to seek to comply with applicable law and regulation. Tr. Ex. 45.

Knispel was rated "minimally successful" on his 2017 EPAP on October 25, 2017, two days after he contacted the EEO department. Tr. Ex. 92. These two events occurred very close in time, but Knispel did not put forth any evidence that ASAC Kootswatewa was aware of Knispel's contact with the EEO when he provided the rating. Moreover, the appraisal period lasted from October 1, 2016, to September 30, 2017. Id. ASAC Kootswatewa provided the rating shortly after the appraisal period ended, which coincided with the investigation into evidence mishandling as noted in Critical Element 3 of the EPAP. Id. Under these circumstances, the timing of lowered EPAP rating and reassignments does not suggest retaliation. Instead, the timing demonstrates ASAC Kootswatewa's response to serious accusations of misconduct.

The same is true for the timing of the 2018 Notice of Removal. Knispel amended his EEO complaint a third time on November 28, 2018, and the 2018 Notice of Removal was issued on December 6, 2018. While the proposed removal action was issued merely eight days after Knispel engaged in protected activity, the decision to remove Knispel from his position at BIA OJS occurred much earlier. ASAC Funk testified that disciplinary action was deferred pending the results of the IAD investigation into evidence mishandling, rude conduct, and negligent performance. That report issued on May 7, 2015, Tr. Ex. 228, and email exchanges between Knispel's supervisory team and Farbro suggest that Farbro began drafting the 2018 Notice of Removal in the summer of 2018. Tr. Ex. 113. Accordingly, the temporal proximity between Knispel amending his EEO complaint and Knispel receiving the 2018 Notice of Removal does not suggest retaliation.

Knispel next sought to show the Secretary's proffered non-retaliatory explanation for the reassignments, the lowered EPAP rating, and the Notices of Removal were pretextual. Knispel attempted to prove pretext in four ways: (1) by rebutting the factual basis underlying the 2018

23

Notice of Removal; (2) by showing Martin and Hernandez were not disciplined for the missing Medina evidence (3) by demonstrating BIA OJS failed to follow Administrative Leave policy; and (4) by showing BIA OJS shifted its explanation for terminating Knispel.

The 2018 Notice of Removal contained five charges. Tr. Ex. 221. Each charge was supported by the IAD Investigation. Tr. Ex. 228. Knispel attempted to rebut each charge either by trying to establish the facts underlying the charge were not true or by trying to demonstrate that the punishment was disproportionate for the charge. Knispel repeatedly asserted that the Medina evidence was not lost during the time he arranged to consolidate the evidence control rooms. The evidence in the Medina murder case went missing during his time as COP for the WNA and thus during the time Knispel was responsible for supervising investigations. Consequently, Knispel's credibility and the credibility of the WNA was impaired, resulting in the WNA being removed from investigating federal cases for the remainder of Knispel's tenure as COP. Knispel admittedly called other BIA employees "pussies" and left his firearm unattended in the restroom. Knispel might feel the Secretary's decision was harsh or unfair, but he has not shown the factual basis underlying the decision to be "unworthy of credence." Fiero, 759 F.3d at 878. "The evidence does not support a determination" that the Secretary "concocted a finding of deficient performance to retaliate against" Knispel. Trambly v. Bd. of Regents of Univ. of Neb., No. 24-1884, 2025 WL 2179309, at *4 (8th Cir. Aug. 1, 2025).

Knispel next attempted to establish pretext by proffering evidence that Hernandez and Martin did not face discipline even though they handled missing evidence in Medina. Neither Hernandez nor Martin constitutes a similarly situated employee. As evidence control technicians, Hernandez and Martin were subordinates of Knispel, and Knispel, as COP, outranked them and supervised them in their duties. Knispel argued that Martin was similarly situated after he was

24

elevated to the position of Acting COP. However, Martin still does not qualify as a similarly situated employee because Martin held that position after the IAD investigation into Knispel's conduct began. See Williams v. United Parcel Serv., Inc., 963 F.3d 803, 809 (8th Cir. 2020) (holding a district manager's successor was not a similarly situated employee). Beyond differences in position and responsibility, Knispel's conduct is distinguishable from that of Hernandez and Martin. See Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000) (noting "the individuals used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."). Knispel, unlike Hernandez and Martin, had three sustained IAD investigations prior to the investigation into missing evidence. Moreover, the 2018 Notice of Removal included charges unrelated to Hernandez, Martin, and the missing Medina evidence: Knispel left his firearm unsecured in a restroom; Knispel left an OJS facility unsecured; Knispel referred to his subordinates as "pussies"; and Knispel disregarded ASAC Funk's directive to report for a temporary duty. Accordingly, the BIA's decision not to remove Hernandez or Martin does not evince pretext.

Knispel also sought to show pretext by demonstrating BIA OJS failed to follow its Administrative Leave policy. Here, Knispel has not shown by a preponderance of the evidence that his extended time on Administrative Leave was connected to his EEO activity. Knispel's extended leave stemmed from prolonged inattention to his 2018 Notice of Removal after its issuance. The charges in the 2018 Notice of Removal—several of which Knispel admitted—were substantiated by the IAD's findings. After ASAC Funk issued Knispel the 2018 Notice of Removal, Melville as the deciding official, should have issued a written decision as soon as practicable. Melville, however, testified he did not recall ever seeing the proposed removal action,

and Knispel offered no evidence to the contrary. Consequently, the 2018 Notice of Removal languished without action until February 2020 when Knispel contacted a BIA human resources official about his retirement. In March 2020, Melville rescinded the 2018 Notice of Removal and issued the 2020 Notice of Removal containing the same factual bases for removal. Knispel requested additional time to respond to the 2020 Notice of Removal and ultimately provided an oral response on August 10, 2020. Tr. Ex. 223. LaPointe issued a Decision of Removal on November 30, 2020. Id. This prolonged period of administrative leave in some ways benefitted Knispel, as he was able to receive pay and benefits and ultimately retire rather than be removed from federal services. The drawn-out administrative leave resulted from bureaucratic oversight and was not from retaliation.

Knispel finally argued that the Secretary's proffered reasons for disciplinary action against Knispel were pretextual because the Secretary shifted his explanation for decisions. While the Secretary did rescind the 2018 Notice of Removal and issue the subsequent 2020 Notice of Removal, the charges and specifications in both were nearly identical. The only difference was the way the facts were organized, as Knispel's failure to secure his firearm was enumerated as its own charge rather than as a specification for the charge of "Careless or Negligent Performance of Duty." Such a minor change does not constitute a shift in explanation and does not establish pretext.

Knispel has not proven by a preponderance of the evidence his engagement in protected activity played a part in any of the Secretary's employment decisions. While not countenancing the Secretary's handling of Knispel's removal and prolonged leave, this Court's review is limited to deciding whether the employment actions were made "free from any discrimination," including

26

retaliation under Title VII. 42 U.S.C. § 2000e-16. Knispel has not met his burden of proof to establish a claim for retaliation under Title VII.

### III.    Conclusion

For the reasons explained above, it is hereby

ORDERED that Judgment for the Defendant enter on Plaintiff's Complaint.

DATED this 6th day of August, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE